UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH MERCOLA, as Trustee of the Joseph M. Mercola Declaration of Trust, JANET SELVIG, as Trustee of the Mercola Insurance Trust, and MERCOLA.COM HEALTH RESOURCES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | |
| vs. | |
| MOSTAFA ABDOU, MARK ZIEBOLD, and THE KOENIG GROUP, LLC, | |
| Defendants. | |

14 C 8170

Judge Feinerman

**MEMORANDUM OPINION AND ORDER**

Joseph Mercola says that he was swindled into purchasing several "premium financed life insurance" policies and lost more than $3 million as a result. Mercola—actually he and his sister, in their capacities as trustees of the trusts that were the policies' beneficiaries, along with his company, another beneficiary, but for ease of exposition the court will refer to all plaintiffs collectively as "Mercola"—filed this suit in October 2014 against the attorney (Mark Ziebold), the insurance broker (Mostafa Abdou), and the broker's employer (Koenig Group, LLC) who allegedly hoodwinked him into purchasing the policies, alleging legal malpractice (against Ziebold), breach of fiduciary duty (against Abdou and Koenig), fraud (against Abdou), and a violation of the Illinois Consumer Fraud and Deceptive Businesses Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. (also against Abdou). Doc. 1. Abdou and Ziebold separately have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint solely on statute of limitations grounds. Docs. 22, 24. The motions are denied.

1

**Background**

On a Rule 12(b)(6) motion to dismiss, the court must accept the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in Mercola's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014); *Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Mercola's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). The facts are set forth as favorably to Mercola as those materials permit. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014); *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

In late 2009, on the recommendation of his financial advisor, Mercola called Abdou about purchasing premium financed life insurance as part of his estate plan. Doc. 1 at ¶¶ 18-19. Mercola told Abdou that he wanted "to avoid high-risk investments and … large commitments of capital." *Id*. at ¶ 19. Abdou responded that premium financed life insurance was "perfect" for Mercola. *Ibid*. In January 2010, Mercola spoke to Abdou again, this time with Ziebold on the line. *Id*. at ¶ 20. Abdou urged Mercola to retain Ziebold as his lawyer, reasoning that Ziebold "was familiar with premium financed life insurance arrangements, and … was an excellent estate planning attorney." *Ibid*. Mercola agreed to retain Ziebold, and he told Ziebold about "his desire to avoid high-risk investments, and his desire to avoid large commitments of capital." *Ibid*.

Mercola spoke to each of them several times in the first half of 2010. *Id*. at ¶ 21. Abdou continued to push premium financed life insurance on Mercola, never disclosing any of its risks; to the contrary, Abdou "repeatedly guarantee[d] the suitability, lack of risk, and 'bullet proof' nature of the premium financed life insurance arrangement." *Id*. at ¶ 26; *see id*. at ¶¶ 22-25. "Abdou explained to Dr. Mercola that premium financed life insurance would allow [Mercola] to secure a large amount of life insurance by using a bank's money to pay the life insurance premiums, [so] that there would be no out-of-pocket expenses. Abdou represented that the only collateral required for the loans would be the policies themselves plus an initial cash deposit. … Abdou further represented that the accumulated values would earn returns that would both cover the loan interest and eventually repay the loan principal." *Id*. at ¶ 23.

With Abdou and Ziebold's encouragement and assistance, between August and November 2010 Mercola eventually purchased four policies, with an aggregate $100 million coverage and nearly $6 million in annual premiums. *Id*. at ¶¶ 32-33. A senior vice president of the lending bank, Northern Trust, told Mercola that he would have to assign the policies to Northern Trust and post $550,000 cash as collateral. *Id*. at ¶ 35. Abdou and Ziebold reassured Mercola that "no additional collateral would be needed because the fixed 3% returns generated by the policies would be sufficient to cover the fixed 3% interest rate on the loans." *Id*. at ¶ 36.

In July 2011, Northern Trust told Mercola that unless he posted an additional $530,000 cash collateral, it would not advance the second year's premiums to the insurer. *Id*. at ¶ 39. The bank required additional collateral mainly for two reasons: because interest on the loan had been added to the balance (thus increasing the effective size of the loan), and because the bank was counting only 95% of the "surrender value" of each policy as collateral. *Id*. at ¶ 40. Neither Abdou nor Ziebold had ever told Mercola that these terms were part of the financing

arrangement or that they would necessitate his posting additional cash collateral. *Id*. at ¶ 42. In September 2011, Northern Trust demanded another $194,000 in cash collateral, for the same reasons. *Id*. at ¶ 41. Mercola posted the additional $724,000 in collateral ($530,000 + $194,000) so that the bank would pay the second year's premiums on the four policies. *Id*. at ¶ 44.

Thereafter, to avoid the accumulated interest's increasing the loan's effective balance, Mercola began directly making interest payments to the bank. *Id*. at ¶ 46. Sometime in 2012, Abdou told Mercola that he had been able to renegotiate the loan's interest rate from 3% to 2%; in August 2012, Northern Trust informed Mercola that he did not need to post any additional collateral to fund the third year's premiums. *Id*. at ¶¶ 45, 47-48.

In September 2013, Northern Trust told Mercola he had to post an additional $2.9 million cash collateral to extend the loans so that the bank could pay the fourth year's premiums. *Id*. at ¶ 49. Unbeknownst to Mercola, each of the policies had a rider, called a "Surrender Value Enhancement Agreement," which allowed him to surrender the policies within three years of issuance in exchange for a full refund of the premiums he had paid to that point; accordingly, the policies' surrender values remained high during that time frame. *Id*. at ¶¶ 50-51. Once three years elapsed, however, the rider expired and the policies' surrender values plummeted, precipitating Northern Trust's $2.9 million collateral demand. *Id*. at ¶¶ 50-52.

Had Mercola known about the rider or that it would expire after three years without possibility of renewal, he never would have purchased the premium financed life insurance policies. *Id*. at ¶ 53-54. Not until October 2013 did Abdou finally disclose to Mercola the full collateral obligations for the premium financed insurance, which would require Mercola to post up to $8.4 million by 2016. *Id*. at ¶ 58. In February 2014, Mercola opted to surrender all four policies and repay the Northern Trust loans rather than continue to incur large collateral

obligations; as a result, he ultimately lost more than $3 million on the deal. *Id*. at ¶¶ 60-61. Mercola filed this suit in October 2014.

## Discussion

Ziebold and Abdou have moved to dismiss the complaint under Rule 12(b)(6) only on statute of limitations grounds. Docs. 21, 25. All parties agree that Illinois law, including its statute of limitations, governs, and that the governing limitations period is two years. *See* 735 ILCS 5/13-214.3(b) ("An action for damages based on tort, contract, or otherwise … against an attorney arising out of an act or omission in the performance of professional services … must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought."); 735 ILCS 5/13-214.4 ("All causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues.").

The parties also agree that the discovery rule may toll the limitations period in this case. "The discovery rule delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 633 N.E.2d 627, 630-31 (Ill. 1994); *see Halperin v. Halperin*, 750 F.3d 668, 671 (7th Cir. 2014) (Illinois law) ("The statute of limitations does not begin to run until the wronged 'person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. At that point the burden is upon the injured person to inquire further as to the existence of a cause of action.'") (quoting *Witherell v. Weimer*, 421 N.E.2d 869, 874 (Ill. 1981)). So even though

5

Mercola purchased the policies in 2010, the limitations period did not begin to accrue until he was on "inquiry notice" of his injury. *Witherell*, 421 N.E.2d at 874; *see Halperin*, 750 F.3d at 671. Defendants argue that this occurred no later than July 2011, when Northern Trust asked him to post the additional $530,000 collateral. Doc. 21 at 8, ¶¶ 32-33; Doc. 25 at 6-7. Mercola counters that, at the earliest, it was September 2013, when he first learned of the surrender value enhancement rider's expiration and the resulting $2.9 million collateral requirement. Doc. 27 at 9-11; Doc. 28 at 10-13.

The Seventh Circuit has cautioned that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004); *see Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *see Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014) ("a motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense") (internal quotation marks omitted).

Mercola has plausibly alleged that he did not discover his true injury until 2013; after all, the problems (as he saw them) that forced him to post additional collateral in 2011 had, he thought, been remedied by his paying interest directly to Northern Trust and by Abdou's renegotiating the interest rate from 3% down to 2%—as evidenced by Mercola's not needing to post additional collateral in 2012 for the third year's premiums. Only when the surrender value

6

enhancement rider expired in 2013 did Mercola finally realize he had truly been injured by Abdou and Ziebold's wrongful actions. Or so, at least, a reasonably sympathetic reader of his complaint could conclude—and, at the Rule 12(b)(6) stage, the court must view the complaint in the light most favorable to Mercola. At any rate, it means that Mercola has not pleaded himself out of court by "admit[ting] all the ingredients of an impenetrable defense," *Xechem*, 372 F.3d at 901, and so dismissal under Rule 12(b)(6) is inappropriate.

## Conclusion

For the foregoing reasons, Abdou's and Ziebold's motions to dismiss are denied. They shall answer the complaint by June 26, 2015.

June 5, 2015

United States District Judge