**United States District Court**
**for the**
**Northern District of Illinois, Eastern Division**

| | | |
|---|---|---|
| JOSEPH MERCOLA, D.O., as Trustee of the | ) | |
| Joseph M. Mercola Declaration of Trust, | ) | |
| JANET SELVIG, as Trustee of the Mercola | ) | |
| Insurance Trust, and MERCOLA.COM | ) | |
| HEALTH RESOURCES, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.    1:14-cv-8170 |
| | ) | |
| | ) | |
| | ) | |
| MOSTAFA ABDOU, MARK ZIEBOLD, and | ) | **JURY DEMAND** |
| THE KOENIG GROUP, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT MARK ZIEBOLD'S ANSWER TO**
**PLAINTIFFS' COMPLAINT AT LAW**

NOW COMES the Defendant, MARK ZIEBOLD, by and through his attorneys, HAY &
OLDENBURG, L.L.C., and in answer to Plaintiffs' Complaint at Law, state as follows:

**NATURE OF THE CASE**

1.     This action arises from a complex insurance sales scheme known in the insurance
industry as "premium financed life insurance."

   **ANSWER:**   The nature of the Complaint speaks for itself; to the extent the allegations
   misstate the transaction, Defendant Ziebold denies said allegations set
   forth in paragraph 1 of the Complaint.

2.     Defendant Abdou (Plaintiffs' insurance broker) and Defendant Ziebold
(Plaintiffs' attorney) induced Plaintiffs to purchase excessive amounts of life insurance from
Minnesota Life Insurance Company ("Minnesota Life"), and to borrow excessive amounts of
money from Northern Trust Corporation ("Northern Trust") to pay the premiums for those life
insurance policies. Defendants Abdou and Ziebold induced Plaintiffs to purchase this excessive

1

life insurance by promising, among other things, that Plaintiffs could secure the life insurance without incurring any out-of-pocket costs, and without having to pledge additional collateral (other than an initial deposit and the policies themselves).

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 2 of the Complaint.

3.      In an effort to induce Plaintiffs to borrow the funds and purchase the life insurance, Defendants Abdou and Ziebold, in violation of their professional and fiduciary duties to Plaintiffs, made material misrepresentations and failed to disclose material information to Plaintiffs.

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 3 of the Complaint.

4.      As a direct and proximate result of Defendants' fraudulent and otherwise wrongful conduct, Plaintiffs entered into the premium financed life insurance arrangement.

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 4 of the Complaint.

5.      By inducing Plaintiffs to enter into the premium financed life insurance arrangement, Defendants made substantial sums of money from brokerage commissions and attorney's fees.

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 5 of the Complaint.

6.      Years after Plaintiffs borrowed the funds from Northern Trust and purchased the life insurance policies from Minnesota Life, it became apparent that the representations made by Defendants were false, that Defendants had failed to disclose important information to Plaintiffs, and that Plaintiffs had been victimized by the wrongful conduct of Defendants. Had Plaintiffs

been properly advised, and had Defendants not made material misrepresentations and omissions, Plaintiffs would not have entered into the premium financed life insurance arrangement.

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 6 of the Complaint.

7. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs lost more than $3,000,000.00. Plaintiffs seek, among other things, compensatory and punitive damages.

> **ANSWER:** Defendant Ziebold denies said allegations set forth in paragraph 7 of the Complaint.

## PARTIES

8. Dr. Mercola is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois. Dr. Mercola is a doctor of osteopathic medicine (D.O.) and is one of the leading natural health practitioners in the United States. Dr. Mercola is the trustee of the Joseph M. Mercola Declaration of Trust.

> **ANSWER:** Defendant Ziebold has insufficient knowledge of the domicile of Dr. Mercola and therefore denies that allegation in paragraph 8 and demands strict proof thereof. On information and belief, Defendant Ziebold admits the remaining allegations set forth in paragraph 8 of the Complaint.

9. Janet Selvig, Dr. Mercola's sister, is an individual who is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois. Janet Selvig is the trustee of the Mercola Insurance Trust. In her capacity as trustee of the Mercola Insurance Trust, Janet Selvig acted at the direction of Dr. Mercola.

> **ANSWER:** Defendant Ziebold has insufficient knowledge of the domicile of Janet Selvig and therefore denies that allegation in paragraph 9 of the Complaint and demands strict proof thereof. Further answering, Defendant Ziebold has insufficient knowledge of the allegation that Selvig acted at the direction of Dr. Mercola and therefore denies that allegation in paragraph 9 of the Complaint and demands strict proof thereof. On information and

belief, Defendant Ziebold admits the remaining allegations in paragraph 9 of the Complaint.

10.     Mercola.com is a Delaware limited liability company with its principal place of business in Illinois. Mercola.com is owned 99% by Dr. Mercola and 1% by Janet Selvig, and thus Mercola.com is a citizen of the State of Illinois. Dr. Mercola is the principal manager of Mercola.com.

> **ANSWER:**  Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 10 of the Complaint and therefore denies same and demands strict proof thereof.

11.     Defendant Abdou is, and at all relevant times has been, a domiciliary and citizen of the State of California. Abdou is an insurance broker who sells insurance for various insurance companies, including Minnesota Life.

> **ANSWER:**  On information and belief, Defendant Ziebold admits the allegations set forth in paragraph 11 of the Complaint.

12.     Defendant Ziebold is, and at all relevant times has been, a domiciliary and citizen of the State of California. Ziebold is an attorney who resides and practices in California.

> **ANSWER:**  Defendant Ziebold admits the allegations set forth in paragraph 12 of the Complaint.

13.     Defendant The Koenig Group, LLC ("Koenig") is a Maryland limited liability company. On information and belief, its members are all citizens of Maryland, and thus Koenig is a citizen of Maryland. Koenig provides financial planning and insurance services to high net worth individuals. Koenig is, and at all relevant times was, Abdou's employer.

> **ANSWER:**  Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 13 of the Complaint and therefore denies same and demands strict proof thereof.

## JURISDICTION AND VENUE

14.     This Court has diversity of citizenship jurisdiction under 28 U.S.C.

§1332(a)(1), because the present matter is a civil action where the matter is controversy

exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

> **ANSWER:**     Defendant Ziebold has insufficient knowledge of the domicile of the
> Plaintiffs and named Defendants and therefore denies the allegations of
> the diversity jurisdiction of this court and demands strict proof thereof.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391, because a

substantial part of the actions and transactions at issue occurred within the Northern District of

Illinois.

> **ANSWER:**     Defendant Ziebold has insufficient knowledge of the actions and
> transactions plead against all the named Defendants and therefore denies
> the allegations of the proper venue of this action and demands strict proof
> thereof.

## FACTS COMMON TO ALL COUNTS

16.     In 2009, Dr. Mercola was interested in updating his estate plan, and in

particular taking steps to provide for asset protection, business succession, and charitable

giving upon his death.

> **ANSWER:**     Defendant Ziebold has knowledge only of the matters communicated by
> Dr. Mercola to him and therefore has insufficient knowledge of the
> allegations set forth in paragraph 16 of the Complaint and therefore denies
> same and demands strict proof thereof.

17.     In achieving his estate planning goals, Dr. Mercola further desired to avoid high-

risk investments and large commitments of capital.

> **ANSWER:**     Defendant Ziebold has knowledge only of the matters communicated by
> Dr. Mercola to him and therefore has insufficient knowledge of the
> allegations set forth in paragraph 17 of the Complaint and therefore denies
> same and demands strict proof thereof.

18.     On or about December 8, 2009, Dr. Mercola had a teleconference with his financial advisor at the time, Garrett Gunderson ("Gunderson"), during which Dr. Mercola notified Gunderson of his estate planning goals and investment parameters. After being informed of Dr. Mercola's goals, Gunderson advised Dr. Mercola to consult with Abdou—an insurance broker who worked for Koenig—regarding the potential for a premium financed life insurance arrangement.

**ANSWER:**     Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 18 of the Complaint and therefore denies same and demands strict proof thereof.

19.     On or about December 24, 2009, Dr. Mercola spoke with Abdou over the phone for the first time. During the call, Dr. Mercola informed Abdou of his estate planning goals, his desire to avoid high-risk investments and his desire to avoid large commitments of capital. During the call, Abdou represented to Dr. Mercola that Dr. Mercola was the perfect candidate for premium financed life insurance because such a product would allow Dr. Mercola to secure a substantial amount of life insurance with no out-of-pocket expense other than posting an initial cash deposit along with pledging the policies as collateral for the premium loans, and that premium financed life insurance would accomplish all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals. As a result of Abdou's representations during this call, Dr. Mercola continued to seek insurance advice from Abdou and Koenig.

**ANSWER:**     Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 19 of the Complaint and therefore denies same and demands strict proof thereof.

20.     On January 7, 2010, Dr. Mercola spoke again with Abdou over the phone. Abdou introduced attorney Ziebold, who was also on the call. Abdou urged Dr. Mercola to retain Ziebold as his attorney. Abdou advised Dr. Mercola that Ziebold was familiar with premium financed life insurance arrangements, and that he was an excellent estate planning attorney. Abdou advised Dr. Mercola that Ziebold could review the premium financed life insurance structure, review the loan documents in connection with borrowing funds from a bank, and could provide excellent legal representation regarding Dr. Mercola's estate plan and business succession plan. On or about January 7, 2010, at Abdou's urging, Dr. Mercola retained Ziebold to represent him in connection with the proposed premium financed life insurance arrangement and in planning his estate. Dr. Mercola informed Ziebold of his estate planning, asset protection, business succession and charitable giving goals, his desire to avoid high-risk investments, and his desire to avoid large commitments of capital.

**ANSWER:**     Defendant Ziebold admits that he had an initial telephone conference with Dr. Mercola and Abdou on or about January 7, 2010 wherein Abdou introduced Dr. Mercola to Ziebold and recommended that Dr. Mercola retain Ziebold, but denies the characterization in paragraph 20 of the Complaint that Abdou "urged" the retention. Ziebold admits there was a discussion that Ziebold could provide legal representation regarding Mercola's estate plan and that Ziebold was a qualified attorney to provide estate planning, but denies that Abdou used the alleged terms "excellent." Defendant Ziebold further admits that as alleged in paragraph 20 of the Complaint he had several more telephone conversations with Dr. Mercola and Abdou on or about January 26, 2010 and February 19, 2010. Defendant Ziebold denies that all the subject matters were discussed at the January 7, 2010 telephone conference as alleged in paragraph 20 of the Complaint, but admits that the following subject matters were discussed over the course of the telephone conferences on January 7, 2010, January 26, 2010 and February 19, 2010: Ziebold admits that there was a discussion that Ziebold had experience with premium financed life insurance in reference to legal services provided for estate planning, and that Ziebold's services would include, if needed, a review of loan documents in connection with any funds Dr. Mercola chose to borrow from a bank. Ziebold denies that there was any discussion regarding Dr.

Mercola's business succession plan. Ziebold admits that Dr. Mercola informed Ziebold of his goals for estate planning, asset protection and charitable giving, but denies Dr. Mercola informed him of his goals for business succession, his desire to avoid high-risk investments, and his desire to avoid large commitments of capital. Defendant Ziebold further admits that the law firm of Ferruzzo & Ferruzzo, LLP was retained by Dr. Joseph Mercola, upon Dr. Mercola's execution of the retention agreement on January 11, 2010, to provide legal services for estate planning. Ziebold denies that either he or the Ferruzzo & Ferruzzo, LLP law firm was retained to review the "structure" of the premium financed life insurance and denies that Abdou advised Dr. Mercla that Ziebold could review the "structure" of the premium financed life insurance. Defendant Ziebold denies any remaining allegations or characterizations set forth in paragraph 20 of the Complaint.

21.     Dr. Mercola spoke with Abdou and Ziebold several more times in early 2010. For example:

a.      Dr. Mercola spoke with Abdou and Ziebold over the phone on January 26, 2010.

b.      Dr. Mercola spoke with Abdou and Ziebold over the phone on February 19, 2010.

c.      Dr. Mercola spoke over the phone with Abdou and Steve Rye (a key employee of Dr. Mercola) on February 11, 2010.

d.      Dr. Mercola spoke with Abdou over the phone on March 20, 2010.

e.      Dr. Mercola spoke with Abdou over the phone on May 17, 2010.

f.      Dr. Mercola spoke with Abdou over the phone on May 31, 2010.

g.      Dr. Mercola met with Abdou and Rebecca Ryan (a Senior Vice President at Northern Trust responsible for premium financed life insurance lending arrangements) at Dr. Mercola's office on May 27, 2010.

h.      On June 9, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye and Amy Legaspi, one of Dr. Mercola's employees.

i.      On June 28, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye, Amy Legaspi, and Chris Portera, Dr. Mercola's tax accountant.

**ANSWER:**      Defendant Ziebold has insufficient knowledge of the allegations set forth regarding communications and meetings between Dr. Mercola and Abdou as set forth in paragraphs 21(c)(d)(e)(f)(g)(h) and (i) of the Complaint and

therefore denies same and demands strict proof thereof. Defendant objects to the statement in paragraph 21 "for example" on the basis it is vague and uncertain and not capable of a proper answer. Notwithstanding said objection, Defendant Ziebold admits the allegations set forth in paragraph 21(a)(b) of the Complaint.

22.     During the teleconferences and meeting, Abdou continued to represent to Dr. Mercola that premium financed life insurance was "perfect" for Dr. Mercola, and told Dr. Mercola that premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals.

**ANSWER:**     Defendant Ziebold has no knowledge of what was discussed at telephone conferences and meetings he was not present and therefore denies the allegations directed to those telephone conferences and meetings set forth in paragraph 22 of the Complaint and demands strict proof thereof. Further answering, Defendant Ziebold denies that Defendant Abdou made the representations alleged in paragraph 22 of the Complaint at the telephone conferences he was present.

23.     During the teleconferences and meeting, Abdou explained to Dr. Mercola that premium financed life insurance would allow him to secure a large amount of life insurance by using a bank's money to pay the life insurance premiums, and that there would be no out-of-pocket expenses. Abdou represented that the only collateral required for the loans would be the policies themselves plus an initial cash deposit. Abdou also represented that the premiums paid for the life insurance would accumulate value in the policies, and that such accumulated values in the policies could be invested in the stock market or in a fixed yield account. Abdou further represented that the accumulated values would earn returns that would both cover the loan interest and eventually repay the loan principal. Abdou advised Dr. Mercola to acquire the life insurance policies from Minnesota Life and to borrow the funds to pay the insurance premiums from Northern Trust.

**ANSWER:**     Defendant Ziebold has no knowledge of what was discussed at telephone conferences and meetings he was not present and therefore denies the allegations directed to those telephone conferences and meetings set forth

in paragraph 23 of the Complaint and demands strict proof thereof. Further answering, Defendant Ziebold admits that at telephone conferences he was present with Dr. Mercola and Abdou, Abdou explained to Dr. Mercola that premium financed life insurance would allow him to secure a large amount of life insurance by borrowing money to pay the life insurance premiums, and that the premiums paid for the life insurance would accumulate value in the policies. Defendant Ziebold further admits that at telephone conferences he was present with Dr. Mercola and Abdou, Abdou recommended the option that Dr. Mercola acquire his chosen life insurance from Minnesota Life and recommended Northern Trust for Dr. Mercola's chosen option to pay the insurance premiums with lending. Further answering, Defendant Ziebold denies that Abdou made the remaining advisements alleged in paragraph 23 of the Complaint at any of the telephone conferences he was present with Abdou and Dr. Mercola.

24.     At all times in 2009 and 2010, Dr. Mercola informed Abdou that he was only interested in a conservative, low-risk investment that would achieve his estate planning, asset protection, business succession, and charitable giving goals. To that end, Dr. Mercola informed Abdou that he did not want his premium payments invested in the stock market. Instead, Dr. Mercola wanted the money invested in a fixed yield account, a conservative investment which would generate the same rate of return each year, regardless of the performance of the market. Abdou stated that investing the premium payments in a fixed yield account would be perfect for the proposed premium financed life insurance arrangement, because the return from the fixed yield account would be greater than or equal to the required interest payments on the loan from Northern Trust.

**ANSWER:**     Defendant Ziebold has no knowledge of what was discussed at telephone conferences and meetings he was not present and therefore denies the allegations directed to those telephone conferences and meetings as set forth in paragraph 24 of the Complaint and demands strict proof thereof.

25.     At all times in 2009 and 2010, Abdou stressed that premium financed life insurance was a suitable strategy for all of Dr. Mercola's goals. At no time did Abdou discuss

other insurance options for Dr. Mercola. Moreover, Abdou presented no other financial products or potential solutions, and Abdou presented no policy value options other than securing the maximum dollar amount Minnesota Life would underwrite. At no time did Abdou ask Dr. Mercola whether he had the cash on hand to secure the life insurance without borrowing funds. Abdou never asked whether Dr. Mercola had alternative uses for his cash that would justify the strategy of borrowing money to pay the premiums, rather than paying the premiums himself.

> **ANSWER:** Defendant Ziebold has no knowledge of what was discussed at telephone conferences and meetings he was not present and therefore denies the allegations directed to those telephone conferences and meetings as set forth in paragraph 25 of the Complaint and demands strict proof thereof.

26. At no time did Abdou disclose to Dr. Mercola any risks associated with the premium financed life insurance arrangement. In fact, Abdou did just the opposite: he repeatedly guaranteeing the suitability, lack of risk, and "bullet proof" nature of the premium financed life insurance arrangement.

> **ANSWER:** Defendant Ziebold denies that Abdou made any of the representations set forth in paragraph 26 of the Complaint during any telephone conferences Ziebold was present with Dr. Mercola and Abou. Further answering, Defendant Ziebold has no knowledge of what was discussed at telephone conferences and meetings he was not present and therefore denies the allegations directed to those telephone conferences and meetings and demands strict proof thereof.

27. On information and belief, Abdou and Ziebold had entered into an arrangement pursuant to which Abdou shared with Ziebold the commissions earned from the sale of life insurance to Plaintiffs. This arrangement was never disclosed to Dr. Mercola by Abdou or Ziebold.

**ANSWER:** Defendant Ziebold denies the allegations set forth in paragraph 27 of the Complaint that he shared commissions earned from the sale of life insurance to Plaintiffs and therefore denies that he had any disclosure obligations to Plaintiffs.

28.    Also on information and belief, Abdou and Ziebold have an arrangement, whereby Abdou recommends Ziebold to his clients who are purchasing large premium financing life insurance, in order to help close the life insurance sale and promote the premium financing life insurance arrangement.

**ANSWER:** Defendant Ziebold denies the allegations set forth in paragraph 28 of the Complaint.

29.    On information and belief, the team of Abdou and Ziebold worked together on numerous occasions over many years to support each other in selling premium financed life insurance to other high net worth individuals.

**ANSWER:** Defendant Ziebold denies that he sells premium financed life insurance and denies all allegations set forth in paragraph 29 of the Complaint; further answering, Defendant Ziebold affirmatively states that this was the first time he provided estate planning for a client in a transaction where Abdou brokered the premium financed life insurance.

30.    Neither Abdou nor Ziebold ever disclosed that they work together on numerous premium financed life insurance arrangements each year, with Abdou selling the premium financing life insurance arrangement, and Ziebold blessing the premium financing structure. Upon information and belief, Abdou referred clients to Ziebold because he knew Ziebold, a supposedly independent legal advisor, would recommend the premium financed life insurance arrangement, regardless of whether it was in the client's best interest. Ziebold never disclosed that his representation was conflicted due to his relationship with Abdou, or that he always recommended premium financed life insurance arrangements to clients referred to him by Abdou.

12

**ANSWER:** Defendant Ziebold denies that he had any conflict of interest or any disclosure obligations to Plaintiff and further denies all allegations set forth in paragraph 30 of the Complaint.

31.     On July 26, 2010, Abdou presented Dr. Mercola with purported policy illustrations that explained how the proposed premium financing arrangement would allegedly work. According to Abdou's illustrations, Dr. Mercola would not be required to spend money out of pocket to support the loan. The illustrations were flawed and deliberately deceptive in a number of ways. For example:

    a.     The illustrations failed to disclose that the insurance policies would incur policy charges of approximately $68,000 each month, and failed to account for such charges in the value projections.

    b.     The illustrations failed to accurately reflect the rate of return generated by the policies. Specifically, although the fixed rate of return for invested premiums on the policies was 3%, the illustrations used a fixed rate of return of 5%.

    c.     The illustrations failed to identify the amount of collateral that would be required to support the loans used to pay the premiums.

**ANSWER:** Defendant Ziebold denies that he provided any illustrations to Dr. Mercola regarding the premium financing and has insufficient knowledge of the allegations set forth in paragraph 31 of the Complaint and therefore denies same and demands strict proof thereof.

32.     Based in part on the flawed policy illustrations, on the representations and omissions of Abdou and Ziebold, and the blessing and promotion of the arrangement by Ziebold, Dr. Mercola agreed to participate in the premium financed life insurance arrangement proposed by Abdou. Specifically, Plaintiffs obtained the following Minnesota Life policies:

| Policy Date | Policy Number | Insured | Beneficiary | Coverage |
|---|---|---|---|---|
| 08/01/2010 | 2-513-132W | Joseph M. Mercola | Joseph M. Mercola Declaration of Trust | $50M |
| 09/24/2010 | 2-518-809W | Joseph M. Mercola | Mercola.com Health Resources LLC | $14M |
| 10/01/2010 | 2-518-762W | Joseph M. Mercola | The Mercola Insurance Trust | $21M |

| 11/19/2010 | 2-525-244W | Steven Andrew Rye | Mercola.com        Health Resources LLC | $15M |
|------------|------------|-------------------|------------------------------------------|------|

**ANSWER:** Defendant Ziebold admits that Minnesota Life policies were obtained by certain unspecified Plaintiffs as set forth in paragraph 32 of the Complaint; further answering, Defendant Ziebold denies the remaining allegations set forth in paragraph 32 of the Complaint.

33.     The annual premiums for these four policies totaled $5,846,694.42.

**ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 33 of the Complaint and therefore denies same and demands strict proof thereof.

34.     Abdou also introduced Dr. Mercola to Rebecca Ryan, who was at that time a Senior Vice President of Northern Trust. Abdou recommended that Northern Trust be the lender for the premium financed life insurance arrangement. During their meeting on May 27, 2010, Ryan represented to Dr. Mercola that the collateral requirements for his loans would be minimal.

**ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 34 of the Complaint and therefore denies same and demands strict proof thereof.

35.     Ryan represented to Dr. Mercola that in order to secure the loans, Dr. Mercola would be required to assign the life insurance policies to Northern Trust as collateral. Northern Trust also required Dr. Mercola to post cash collateral in the amount of $550,000.

**ANSWER:** On information and belief, Defendant Ziebold admits the allegations set forth in paragraph 35 of the Complaint regarding the posting of collateral but has insufficient knowledge of the amount of collateral posted and therefore denies same and demands strict proof thereof.

36.     Dr. Mercola was concerned about posting such substantial collateral. In the spring and summer of 2010, Abdou and Ziebold reassured Dr. Mercola that beyond

14

the initial $550,000, no additional collateral would be needed because the fixed 3% returns generated by the policies would be sufficient to cover the fixed 3% interest rate on the loans, and thus the assignment of the policies plus the $550,000 cash collateral would be sufficient security for the loans.

> **ANSWER:** Defendant Ziebold has insufficient knowledge of Dr. Mercola's concerns and therefore denies those allegations and demands strict proof thereof. Further answering, Defendant Ziebold denies the remaining allegations set forth in paragraph 36 of the Complaint.

37. At the urging of Abdou and Ziebold, Dr. Mercola arranged to finance the policy premiums with loans from Northern Trust.

> **ANSWER:** Defendant Ziebold admits that Dr. Mercola financed the policy premiums with loans from Northern Trust but deny the characterization in paragraph 37 of the Complaint that the transaction was done at the urging of Abdou and Ziebold.

38. In reliance on the misrepresentations and omissions of Abdou and Ziebold, the Plaintiffs acquired the four Minnesota Life policies, financed by loans from Northern Trust.

> **ANSWER:** Defendant Ziebold denies the allegations set forth in paragraph 38 of the Complaint.

39. In July 2011, contrary to Abdou and Ziebold's prior representations, Northern Trust required Dr. Mercola to post an additional $530,000 cash collateral. Northern Trust represented that if Dr. Mercola did not post the additional collateral, Northern Trust would not advance the funds necessary to pay the second year's insurance premiums.

> **ANSWER:** On information and belief, Defendant Ziebold admits that in July 2011 Dr. Mercola was advised he needed to post an additional cash collateral but has insufficient knowledge of the amount of collateral posted and therefore denies same and demands strict proof thereof. Further answering, Defendant Ziebold denies that this was contrary to Mr.

Ziebold's prior representations. Further answering, Defendant Ziebold has insufficient knowledge of the remaining allegations set forth in paragraph 39 of the Complaint and therefore denies same and demands strict proof thereof.

40. The requirement for the additional collateral in July 2011 was primarily driven by two factors: (a) the interest charged for the loans was being added to the loan balance, thereby increasing the principal amount of the loan, and (b) Northern Trust was only using 95% of the surrender value of each policy as collateral, as opposed to the full surrender value.

> **ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 40 of the Complaint and therefore denies same and demands strict proof thereof.

41. For the same reasons, in September 2011, in addition to the $530,000 additional cash collateral posted in July 2011 for policy 2-513-132W, Dr. Mercola was required to post an additional $194,000 cash collateral (for policies 2-518-809W, 2-518-762W and 2-525-244W).

> **ANSWER:** On information and belief, Defendant Ziebold admits that an additional cash collateral was posted as set forth in paragraph 41 of the Complaint but has insufficient knowledge of the amount of collateral posted and therefore denies same and demands strict proof thereof. Further answering, Defendant Ziebold has insufficient knowledge of who posted the cash collateral or the reasons the collateral was posted as set forth in paragraph 41 of the Complaint and therefore denies same and demands strict proof thereof.

42. Dr. Mercola was shocked and concerned at Northern Trust's demands. Neither Abdou nor Ziebold ever told Dr. Mercola that the interest charged for the loan would be added to the loan balance, or that doing so would cause Northern Trust to require additional collateral. Prior to July 2011, neither Abdou nor Ziebold ever told Dr. Mercola that only 95% of the surrender value of the policies would be used as collateral for the premium loans.

> **ANSWER:** Defendant Ziebold has insufficient knowledge of Dr. Mercola's mental state to either deny or admit that Dr. Mercola was shocked and concerned

16

at Northern Trust's request for additional collateral, but affirmatively states that Dr. Mercola never expressed concern or shock to him. Further answering, Defendant Ziebold denies the remaining allegations set forth in paragraph 42 of the Complaint.

43.     Furthermore, neither Abdou nor Ziebold ever advised Dr. Mercola that any additional collateral could be required to extend the loans necessary to continue the financing arrangement. In fact, Abdou and Ziebold continually represented that no additional collateral would ever be required.

**ANSWER:**     Defendant Ziebold denies the allegations set forth in paragraph 43 of the Complaint.

44.     Rather than permit the policies to lapse, Dr. Mercola posted the additional collateral, extended the loans, and paid the second year's premiums for the four policies to Minnesota Life.

**ANSWER:**     As to the allegations set forth in paragraph 44 of the Complaint, Defendant Ziebold affirmatively states that the allegation is factually inaccurate insofar as it alleges "rather than permit the policies to lapse" and therefore the allegations are not capable of being answered accurately. To the extent an answer is required, Defendant Ziebold denies the allegations set forth in paragraph 44 of the Complaint.

45.     Abdou recognized that Dr. Mercola was very upset with the misrepresentations Abdou and Ziebold had made and the fact that Dr Mercola was required to post substantial additional collateral. Thus, in 2012, Abdou informed Dr. Mercola that he had been able to negotiate the Northern Trust loan interest rate down from 3% to 2%.

**ANSWER:**     Defendant Ziebold has no knowledge of the allegations set forth in paragraph 45 directed to Abdou and therefore denies same and demands strict proof thereof.

46.     Dr. Mercola, concerned about the increasing loan balance and collateral requirements, decided to pay the interest directly instead of having the interest accumulate

as part of the loan balance. As a result, Dr. Mercola made the following interest payments to

Northern Trust:

      a. December 31, 2012: $143,844.46;
      b. June 28, 2013: $181,981.24; and
      c. January 17, 2014: $156,368.65.

    **ANSWER:**    As to the allegations in paragraph 46 of the Complaint, Defendant Ziebold has no knowledge that Dr. Mercola made any interest payments to Northern Trust and therefore denies same and demands strict proof thereof.

    47.    On August 10, 2012, on behalf of Northern Trust, Ryan informed Dr. Mercola

that no additional collateral was required to extend the loans necessary to fund the premiums for

the four policies in 2012.

    **ANSWER:**    Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 47 of the Complaint and therefore denies same and demands strict proof thereof.

    48.    Dr. Mercola's loans were thus extended, and Northern Trust advanced the sums to

pay the third year's premiums for the four policies to Minnesota Life.

    **ANSWER:**    On information and belief, Defendant Ziebold admits the allegations in paragraph 48 of the Complaint.

    49.    The following year, on September 25, 2013, on behalf of Northern Trust, Ryan

sent an email to Dr. Mercola showing a collateral shortfall of $2.9 million. As a result of the

shortfall, Ryan informed Dr. Mercola that he would need to post at least $2.9 million in

additional cash collateral in order to extend the loans and to keep the four life insurance

policies in effect.

    **ANSWER:**    Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 49 of the Complaint and therefore denies same and demands strict proof thereof.

50.     The sudden increase in the collateral requirement was due to the expiration of a Surrender Value Enhancement Agreement that was a rider to each of the four policies.

**ANSWER:**     Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 50 of the Complaint and therefore denies same and demands strict proof thereof.

51.     The Surrender Value Enhancement Agreement provided that, for the first three years of the policies, Dr. Mercola could surrender the policies at any point and receive a surrender value equal to the amount he had paid in premiums to that point in time. Thus, for the first three years of the policies (until 2013), the surrender value of the four policies was higher than it otherwise would have been, and thus, Dr. Mercola did not have to post additional collateral.

**ANSWER:**     Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 51 of the Complaint and therefore denies same and demands strict proof thereof.

52.     However, in 2013, when the Surrender Value Enhancement Agreement expired, the surrender value of the policies did not equal the amount Dr. Mercola had paid in premiums. Rather, the surrender value equaled only the accumulated value of the policies, less undisclosed surrender charges to that point. Thus, the surrender value was significantly less than the total premiums Dr. Mercola had paid. Unbeknownst to Dr. Mercola, policy charges (approximately $68,000 per month) were being deducted from the accumulated value in the policies. Also, unbeknownst to Dr. Mercola, the surrender value of the policies was no longer protected by the Surrender Value Enhancement Agreement. As a result, in 2013 the accumulated value in the policies was much lower than expected, and the collateral required by Northern Trust to support the loans increased dramatically.

**ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 52 of the Complaint and therefore denies same and demands strict proof thereof.

53.     Neither Abdou nor Ziebold had ever informed Dr. Mercola that such large sums of collateral could be required by Northern Trust. In fact, such a collateral requirement was contrary to the representations made by Abdou and Ziebold. Had Dr. Mercola been aware of the true arrangement and collateral requirements, he never would have entered into a premium financed life insurance arrangement.

**ANSWER:** Defendant Ziebold denies the allegations set forth in paragraph 53 of the Complaint.

54.     Neither Abdou nor Ziebold ever disclosed to Dr. Mercola that the Surrender Value Enhancement Agreement could not be renewed beyond the first three years. Furthermore, neither Abdou nor Ziebold ever explained the effect the expiration of the Surrender Value Enhancement Agreement would have on Dr. Mercola's collateral until after the Surrender Value Enhancement Agreement had expired.

**ANSWER:** Defendant Ziebold denies that the scope of his retention included financial advisements regarding the structure of the premium financed life insurance and therefore denies that he had any duties to disclose the matters set forth in paragraph 54 of the Complaint. Further answering, Defendant Ziebold has insufficient knowledge of the financial structure of the insurance or the discussions between Abdou and Dr. Mercola on such financial structure and therefore denies the allegations in paragraph 54 and demands strict proof thereof.

55.     Furthermore, on multiple occasions, including in an email dated October 1, 2013 (after the Surrender Value Enhancement Agreement had apparently already expired) Abdou assured Dr. Mercola that the Surrender Value Enhancement Agreement rider remained in effect, and would remain in effect.

20

**ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 55 of the Complaint and therefore denies same and demands strict proof thereof.

56.     Neither Abdou nor Ziebold ever disclosed to Dr. Mercola the substantial monthly policy charges associated with the insurance policies, the fact that the policy charges decreased the accumulated value of the policies, or the effect such charges would have on the collateral requirements for the loans.

**ANSWER:** Defendant Ziebold denies that the scope of his retention included financial advisements regarding the structure of the premium financed life insurance and therefore denies that he had any duties to disclose the matters set forth in paragraph 56 of the Complaint.     Further answering, Defendant Ziebold has insufficient knowledge of the financial structure of the insurance or the discussions between Abdou and Dr. Mercola on such financial structure and therefore denies the allegations in paragraph 56 and demand strict proof thereof.

57.     Indeed, when Dr. Mercola inquired about the policy charges with Abdou in 2010, Abdou informed Dr. Mercola that such charges were minimal and were not to be worried about.

**ANSWER:** Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 57 of the Complaint and therefore denies same and demands strict proof thereof.

58.     On or about October 22, 2013, Abdou sent Dr. Mercola an email that disclosed, for the first time, the total collateral requirements for the loans. Contrary to what Abdou and Ziebold had previously told Dr. Mercola, Abdou's email explained that Dr. Mercola would need to post millions of dollars of additional collateral each year, up to $8.4 million in additional collateral by 2016.

     **ANSWER:**    Defendant Ziebold denies the alleged representations by him as set forth in paragraph 58 of the Complaint; further answering, Defendant Ziebold has insufficient knowledge of the remaining allegations set forth in paragraph 58 of the Complaint and therefore denies same and demands strict proof thereof.

     59.    Dr. Mercola never would have participated in the premium financed life insurance arrangement had he known the true policy costs and the true collateral requirements.

     **ANSWER:**    Defendant Ziebold denies that Dr. Mercola was uninformed about the policy costs and collateral requirements of the insurance and therefore denies the allegations set forth in paragraph 59 of the Complaint.

     60.    On or around February 28, 2014, after learning of the previously concealed policy costs and collateral requirements, Dr. Mercola elected to surrender all four policies and repay the Northern Trust loans. Dr. Mercola forfeited the $14,956,575.53 surrender value of the policies, the $1.3 million in cash collateral that he previously posted, and additional out-of-pocket sums.

     **ANSWER:**    Defendant Ziebold denies the policy costs and collateral requirements were concealed from Dr. Mercola; further answering, Defendant Ziebold has insufficient knowledge of the remaining allegations set forth in paragraph 60 of the Complaint and therefore denies same and demands strict proof thereof.

     61.    In total, Dr. Mercola, through his trusts and company, lost more than $3 million as a result of the premium financed life insurance arrangement.

     **ANSWER:**    Defendant Ziebold has insufficient knowledge of the allegations set forth in paragraph 61 of the Complaint and therefore denies same and demands strict proof thereof.

### COUNT I:  Breach of Fiduciary Duty
### (Plaintiffs v. Abdou and Koenig)

62-66.  As Count I, paragraph 62 to 66, are not directed to Defendant Ziebold, Defendant Ziebold makes no answer thereto.

**COUNT II:  Legal Malpractice**
**(Plaintiffs v. Ziebold)**

67.     Plaintiffs incorporate by reference paragraphs 1 through 66 as though fully restated herein.

> **ANSWER:**   Defendant Ziebold incorporates his Answers to paragraphs 1 through 66 as though fully stated herein.

68.     Defendant Ziebold was retained to analyze and implement a comprehensive estate plan for Dr. Mercola, including an independent review of the premium financing life insurance arrangement proposed by Abdou. As Dr. Mercola's attorney, Ziebold owed Dr. Mercola fiduciary duties of the highest order.

> **ANSWER:**   As to the allegations set forth in paragraph 68 of the Complaint, Defendant Ziebold admits that he was retained by Dr. Mercola to perform estate planning services and that in performing said services he owed duties to Dr. Mercola as set forth by law.  Further answering, Defendant Ziebold denies that he was retained to perform an independent review of the premium financing life insurance arrangement and further denies the remaining allegations set forth in paragraph 68 of the Complaint insofar as they are inconsistent with law.

69.     When Dr. Mercola retained Ziebold to perform estate planning services, Dr. Mercola identified several goals that he wanted his estate plan to achieve.

> **ANSWER:**   As to the allegations set forth in paragraph 69 of the Complaint, Defendant Ziebold admits that he discussed with Dr. Mercola goals for his estate planning and options available to achieve those goals.

70.     Dr. Mercola explained to Ziebold that he wanted to establish a structure to protect his assets from potential creditors.

> **ANSWER:**   As to the allegations set forth in paragraph 70 of the Complaint, Defendant Ziebold admits that one of the goals Dr. Mercola discussed with Defendant Ziebold was to protect his assets from potential creditors, but

denies that Dr. Mercola gave an explanation of "a structure" to protect his assets from potential creditors.

71.     In addition, Dr. Mercola explained to Ziebold that he wanted to pass along management control of Mercola.com to his key employees.

    **ANSWER:**     Defendant Ziebold denies the allegations set forth in paragraph 71 of the Complaint.

72.     Dr. Mercola also explained to Ziebold that he wanted to ensure that the bulk of his assets would pass to a charity of his choosing, with minimum tax consequences.

    **ANSWER:**     Defendant Ziebold denies the allegations set forth in paragraph 72 of the Complaint.

73.     The course of action recommended by Ziebold met none of Dr. Mercola's objectives. Ziebold, exploiting his position as Dr. Mercola's attorney, fraudulently induced Dr. Mercola to obtain the premium financed life insurance endorsed by Abdou and Ziebold. Ziebold falsely advised Dr. Mercola that premium financed life insurance was a "no-brainer," that it had no risks, and that it would meet all of his estate planning goals. Ziebold's intent was to bless the premium financed life insurance scheme for Abdou's and Ziebold's benefit. In violation of his fiduciary duties, Ziebold advised Dr. Mercola to enter into an arrangement that benefited Abdou and Ziebold at Dr. Mercola's expense.

    **ANSWER:**     Defendant Ziebold denies each and every allegation set forth in paragraph 73 of the Complaint.

74.     On information and belief, Ziebold urged Dr. Mercola to obtain premium financed life insurance because Abdou refers many clients to Ziebold, and Ziebold knew that in order to retain Abdou as a referral source, Ziebold had to recommend the premium financed life insurance arrangement to Dr. Mercola and implement all the legal work necessary to close the premium financed life insurance sale.

24

**ANSWER:**     Defendant Ziebold denies each and every allegation set forth in paragraph 74 of the Complaint.

75.     Also, on information and belief, Ziebold urged Dr. Mercola to obtain premium financed life insurance because he shared in the commissions generated by the sale of such policies.

**ANSWER:**     Defendant Ziebold denies the allegations set forth in paragraph 75 of the Complaint.

76.     Premium financed life insurance was entirely unsuitable for a client with Dr. Mercola's estate planning, asset protection, business succession and charitable giving objectives. It was also unsuitable for a client who wished to (a) invest conservatively in fixed income products, and (b) avoid large commitments of capital.

**ANSWER:**     Defendant Ziebold denies the allegations set forth in paragraph 76 of the Complaint.

77.     For example, Ziebold (who is not licensed in Illinois) guaranteed that the values of the life insurance policies were completely protected from creditors. However, this was not the case under the applicable Illinois statute.

**ANSWER:**     Defendant Ziebold denies that he "guaranteed" the values of the life insurance policies were completely protected from creditors, but admits that he advised the policy was protected from creditors while the lender had first priority on the policy.  Further answering, Defendant Ziebold states that the referred to Illinois statute was not applicable to the insurance at the time and therefore Defendant Ziebold denies the remaining allegations set forth in paragraph 77 of the Complaint.

78.     Furthermore, the excessive dollar amount of life insurance purchased through the premium financing scheme, which was encouraged and approved by Ziebold, had no specific purpose in Dr. Mercola's estate plan. Rather, the amount of coverage secured was

simply the maximum amount that Minnesota Life would underwrite, and thus the amount that would generate the largest premiums and commissions for Abdou and Ziebold.

> **ANSWER:** Defendant Ziebold denies the allegations set forth in paragraph 78 of the Complaint.

79.     Other portions of the estate plan Ziebold implemented were flawed or non-existent. For example, Dr. Mercola wanted the management of <u>Mercola.com</u> to be transferred to his key employees after his death. No such succession plan was implemented.

> **ANSWER:** Defendant Ziebold affirmatively states that he was not retained to implement a succession plan. Further Answering, Defendant Ziebold denies the allegations set forth in paragraph 79 of the Complaint.

80.     The estate plan Ziebold set up would have transferred most of Dr. Mercola's assets (including <u>Mercola.com</u>) to Dr. Mercola's private charitable foundation upon his death. Ziebold, however, never advised Dr. Mercola of the extreme adverse tax consequences of a private charitable foundation owning a majority interest in a valuable operating business such as <u>Mercola.com</u>.

> **ANSWER:** Defendant Ziebold admits the allegation in paragraph 80 that the estate plan Ziebold set up would have transferred most of Dr. Mercola's assets (including Mercola.com) to Dr. Mercola's private charitable foundation upon his death. Defendant Ziebold denies the remaining allegations set forth in paragraph 80 of the Complaint.

81.     As an estate planning attorney, Ziebold knew or should have known of the flaws in the overall estate plan he implemented on Dr. Mercola's behalf, as well as the inherent flaws in the premium financed life insurance portion of the estate plan. Nevertheless, Ziebold recommended that Dr. Mercola pursue the premium financed life insurance.

> **ANSWER:** Defendant Ziebold admits that he recommended premium finance life insurance as one of the recommended options for Dr. Mercola. Further answering, Defendant Ziebold denies the implemented estate plan was

flawed and denies the remaining allegations in paragraph 81 of the Complaint.

82.    Ziebold performed no comprehensive estate planning. In addition, any estate planning Ziebold implemented was fundamentally flawed and had to be redone by new estate planning counsel.

**ANSWER:**    Defendant Ziebold denies the allegations set forth in paragraph 82 of the Complaint.

83.    Ziebold breached the standard of care an attorney owes to his client and committed legal malpractice by:

    a.    failing to appropriately structure Dr. Mercola's estate plan;

    b.    implementing an estate plan that upon Dr. Mercola's death would have led to severe adverse tax consequences if Dr. Mercola's controlling interest in Mercola.com was transferred to Dr. Mercola's private foundation.

    c.    failing to disclose his conflict of interest generated by his relationship with Abdou;

    d.    failing to disclose that he and Abdou had worked on and implemented numerous premium financed life insurance arrangements together and that he has a clear interest and bias to this type of planning;

    e.    inducing Dr. Mercola to implement a strategy that was detrimental to his interests, but which resulted in substantial gain to Abdou and Ziebold;

    f.    improperly encouraging Dr. Mercola to purchase excessive amounts of premium financed life insurance;

    g.    incorrectly advising Dr. Mercola that premium financed life insurance was a "bullet proof" asset protection strategy and the cash value of the policy was guaranteed to be protected;

    h.    incorrectly advising Dr. Mercola that premium financed life insurance would achieve all of Dr. Mercola's stated estate planning, asset protection, business succession and charitable giving objectives, when Ziebold knew or should have known that this was not true;

    i.    failing to disclose the policy charges associated with the four Minnesota Life policies;

    j.    failing to disclose the collateral requirements associated with the Northern Trust loans and the potential adverse effects related thereto;

    k.    failing to advise that the Surrender Value Enhancement Agreement was only effective for three years;

    l.    failing to advise that the Surrender Value Enhancement Agreement was potentially non-renewable;

m.    failing to advise Dr. Mercola of the effect that the Surrender Value Enhancement Agreement's expiration would have on his collateral position with Northern Trust; and

n.    otherwise failing to represent Dr. Mercola.

**ANSWER:**   Defendant Ziebold denies the allegations set forth in paragraph 83 (a) through (n) inclusive of the Complaint.

84.    As a result of Ziebold's breaches of his fiduciary duty and legal malpractice, Dr. Mercola was forced to obtain new estate planning counsel and incur costs to correct his estate planning. Through his trusts and his company, <u>Mercola.com</u>, Dr. Mercola was damaged in excess of $3 million.

**ANSWER:**   Defendant Ziebold denies the allegations set forth in paragraph 84 of the Complaint.

### COUNT III:  Fraud
### (Plaintiffs v. Abdou)

85-99. As Count III, paragraphs 85-99, are not directed to Defendant Ziebold, Defendant Ziebold makes no answer thereto.

### COUNT IV:  Consumer Fraud
### (Plaintiffs v. Abdou)

100-107. As Count III, paragraphs 100-107, are not directed to Defendant Ziebold, Defendant Ziebold makes no answer thereto.

WHEREFORE, DEFENDANT MARK ZIEBOLD denies that Plaintiffs are entitled to judgment in any sum whatsoever and respectfully requests that the matter be dismissed with prejudice and with costs.

**FIRST AFFIRMATIVE DEFENSE**
**ACTION IS BARRED BY THE STATUTE OF LIMITATIONS**

NOW COMES the Defendant, MARK ZIEBOLD, by and through his attorneys, HAY & OLDENBURG, L.L.C., and for his First Affirmative Defense to the Plaintiffs' Complaint at Law, state as follows:

1.     Plaintiffs filed this action for legal malpractice against Defendant Mark Ziebold on October 17, 2014.

2.     Section 13-214.3 of the Illinois Code of Civil Procedure (735 Ill. Comp. Stat. Sec. 5/13-214.3(b)) governs this action and required Plaintiffs to file the action within two years from the time Plaintiffs knew or reasonably should have known of the injury for which damages are sought and that the injury was wrongfully caused.

3.     If in fact the jury finds that Plaintiffs were injured as a result of wrongful conduct as alleged in the Complaint, which Defendant Mark Ziebold denies, Plaintiffs knew or reasonably should have known of their injury and its wrongful cause some time before October 17, 2012.

4.     The Complaint was not timely filed within two years of Plaintiffs discovery of the action and therefore is time-barred.


WHEREFORE, DEFENDANT MARK ZIEBOLD denies that Plaintiffs are entitled to judgment in any sum whatsoever and respectfully requests that the matter be dismissed with prejudice and with costs.

## SECOND AFFIRMATIVE DEFENSE
## LACK OF STANDING

NOW COMES the Defendant, MARK ZIEBOLD, by and through his attorneys, HAY & OLDENBURG, L.L.C., and for his Second Affirmative Defense to the Plaintiffs' Complaint at Law, state as follows:

1.     Plaintiffs bring this action against Mark Ziebold alleging legal malpractice, and allege damages incurred by Plaintiffs when Dr. Mercola forfeited the premium financed life insurance policies.

2.     Plaintiffs lack standing to bring the claim against Defendant Mark Ziebold.

WHEREFORE, DEFENDANT MARK ZIEBOLD denies that Plaintiffs are entitled to judgment in any sum whatsoever and respectfully requests that the matter be dismissed with prejudice and with costs.

## THIRD AFFIRMATIVE DEFENSE
## CONTRIBUTORY NEGLIGENCE

NOW COMES the Defendant, MARK ZIEBOLD, by and through his attorneys, HAY & OLDENBURG, L.L.C., and for his Third Affirmative Defense to the Plaintiffs' Complaint at Law, state as follows:

1.  At all times set forth in the allegations in the Complaint, Dr. Joseph Mercola sought the advice of financial advisors and other third persons regarding the premium financed life insurance he chose for his estate planning.

2.     Dr. Mercola had an independent duty to exercise due care in the management of his finances and to follow the advice of financial advisors.

3.      In violation of said independent duty, Dr. Mercola failed to follow the advice of financial advisors and third persons regarding the premium financed life insurance he chose for his estate planning.

4.      As a direct and proximate result of the above referenced acts or omissions, Plaintiffs suffered the damages alleged in the Complaint.

WHEREFORE, DEFENDANT MARK ZIEBOLD prays that this Court find that if Dr. Mercola's own comparative negligence exceeds 50% of the pro rata cause of the occurrence and Plaintiffs' injuries, that a verdict be entered in favor of Defendant Mark Ziebold and against Plaintiffs.  In the alternative Defendant Mark Ziebold prays that any verdict entered against Defendant Ziebold be reduced to the pro rata extent of Dr. Mercola's own comparative negligence caused Plaintiffs' injuries.

## **<u>DEMAND FOR JURY BY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Defendant Mark Ziebold demands trial by jury in this action of all issues so triable.

Dated:  June 26, 2015

By:<u>/s/Patricia M. Noonan</u>
    **Attorney for Defendant**
    **Mark Ziebold**


Linda J. Hay
Patricia M. Noonan
Hay & Oldenburg, L.L.C.
221 North LaSalle Street, Suite 2300
Chicago, Illinois 60601
(lhay@illinois-law.com)
(pnoonan@illinois-law.com)
(312) 704-8444

**United States District Court**
**for the**
**Northern District of Illinois, Eastern Division**

| | | |
|---|---|---|
| JOSEPH MERCOLA, D.O., as Trustee of the | ) | |
| Joseph M. Mercola Declaration of Trust, | ) | |
| JANET SELVIG, as Trustee of the Mercola | ) | |
| Insurance Trust, and MERCOLA.COM | ) | |
| HEALTH RESOURCES, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.    1:14-cv-8170 |
| | ) | |
| | ) | |
| | ) | |
| MOSTAFA ABDOU, MARK ZIEBOLD, and | ) | |
| THE KOENIG GROUP, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2015, I electronically filed the foregoing **Defendant Mark Ziebold's Answer to Plaintiff's Complaint at Law** with the Clerk of Court using the CM/ECF system to all counsel of record below.


By:    /s/Patricia M. Noonan
         Attorney for Defendant
         Mark Ziebold


*Attorneys for Plaintiffs*
David S. Americus
Peter John Wozniak
Stephen H. Leech
Gozdecki and Del Giudice, LLP
One East Wacker Drive
Suite 1720
Chicago, Illinois 60601
Phone: (312) 782-5010
Fax:     (312) 782-4324
Email: d.americus@gozdel.com
Email:  p.wozniak@gozdelcom
Email: s.leech@gozdel.com

**_Attorney for Mostafa Abdou – Lead Counsel_**
Joseph M. Aliberti
Law Offices of Joseph M. Aliberti
260 New Port Center Drive, Suite 100
Newport Beach, CA 92660
Phone: (949) 724-0550
Fax:     (949) 743-5858
Email:  jma@alibertilaw.com


**_Attorneys for Mostafa Abdou_**
David A. Baugh
David R. Carlson
Baugh Dalton, LLC
135 S. LaSalle Street
Suite 2100
Chicago, Illinois 60603
Phone: (312) 759-1400
Fax:     (312) 759-0402
Email: dbaugh@baughdaltonlaw.com
Email: dcarlson@baughdaltonlaw.com

**_Attorneys for The Koenig Group, LLC_**
Christopher P. Hemphill
Tia C. Ghattas
Cozen O'Conner
123 North Wacker Drive
Suite 1800
Chicago, IL 60606
Phone: (312) 382-3100
Fax:     (312) 382-8910
Email:  chemphill@cozen.com
          tghattas@cozen.com