## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH MERCOLA, D.O., as Trustee of the Joseph M. Mercola Declaration of Trust, JANET SELVIG, as Trustee of the Mercola Insurance Trust, and MERCOLA.COM HEALTH RESOURCES, LLC | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 1:14-CV-8170 |
| MOSTAFA ABDOU, MARK ZIEBOLD, MINNESOTA LIFE INSURANCE COMPANY FERRUZZO & FERRUZZO LLP and THE KOENIG GROUP, LLC | ) ) ) ) ) | **JURY DEMAND** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs JOSEPH MERCOLA, D.O. ("Dr. Mercola"), as Trustee of the Joseph M. Mercola Declaration of Trust, JANET SELVIG, as Trustee of the Mercola Insurance Trust ("Ms. Selvig"), and MERCOLA.COM HEALTH RESOURCES, LLC ("Mercola.com", and together with Dr. Mercola, Ms. Selvig, and Mercola.com, "Plaintiffs"), through their attorneys, Gozdecki, Del Giudice, Americus, Farkas & Brocato LLP, hereby complain of Defendants, MOSTAFA ABDOU ("Abdou"), MARK ZIEBOLD ("Ziebold"), MINNESOTA LIFE INSURANCE COMPANY ("Minnesota Life") FERRUZZO & FERRUZZO LLP ("Ferruzzo & Ferruzzo"), ZIEBOLD LAW GROUP, P.C. ("Ziebold Law Group") and THE KOENIG GROUP, LLC ("Koenig"), as follows:

## NATURE OF THE CASE

1. This action arises from a complex insurance sales scheme known in the insurance industry as "premium financed life insurance."

2. Abdou (Plaintiffs' insurance broker) and Ziebold (Plaintiffs' attorney) induced Plaintiffs to purchase excessive amounts of life insurance from Minnesota Life, and to borrow excessive amounts of money from Northern Trust Corporation ("Northern Trust") to pay the premiums for those life insurance policies. Abdou, while Abdou was employed by Koenig, and Ziebold, while Ziebold was employed with Ferruzzo & Ferruzzo, induced Plaintiffs to purchase this excessive life insurance by promising, among other things, that Plaintiffs could secure the life insurance without incurring any out-of-pocket costs, and without having to pledge additional collateral (other than an initial deposit and the policies themselves).

3.     In an effort to induce Plaintiffs to borrow the funds and purchase the life insurance, Abdou and Ziebold violated their professional and fiduciary duties to Plaintiffs, made material misrepresentations, and failed to disclose material information to Plaintiffs.

4.     As a direct and proximate result of Abdou and Ziebold's fraudulent and otherwise wrongful conduct, Plaintiffs entered into the premium financed life insurance arrangement with Minnesota Life insurance policies.

5.     By inducing Plaintiffs to enter into the premium financed life insurance arrangement with Minnesota Life policies, Defendants made substantial sums of money from brokerage commissions and attorney's fees.

6.     Years after Plaintiffs borrowed the funds from Northern Trust and purchased the life insurance policies from Minnesota Life, it became apparent that the representations made by Abdou and Ziebold were false, that Abdou and Ziebold had failed to disclose important information to Plaintiffs, and that Plaintiffs had been victimized by Abdou and Ziebold's wrongful conduct. Had Plaintiffs been properly advised, and had Abdou and Ziebold not made material misrepresentations and omissions, Plaintiffs would not have entered into the premium financed life insurance arrangement with Minnesota Life insurance policies.

7.     As a direct and proximate result of Abdou, while Abdou was employed by Koenig, and Ziebold's wrongful conduct in selling Minnesota Life policies, while Ziebold was employed with Ferruzzo & Ferruzzo, Plaintiffs lost more than $3,000,000.00. Plaintiffs seek, among other things, compensatory and punitive damages.

## PARTIES

8.     Dr. Mercola is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois. Dr. Mercola is a doctor of osteopathic medicine (D.O.) and is one of the leading natural health practitioners in the United States. Dr. Mercola is the trustee of the Joseph M. Mercola Declaration of Trust.

9.     Ms. Selvig, Dr. Mercola's sister, is an individual who is, and at all relevant times has been, a domiciliary and citizen of the State of Illinois. Ms. Selvig is the trustee of the Mercola Insurance Trust. In her capacity as trustee of the Mercola Insurance Trust, Ms. Selvig acted at the direction of Dr. Mercola.

10.     Mercola.com is a Delaware limited liability company with its principal place of business in Illinois. Mercola.com is owned 99% by Dr. Mercola and 1% by Ms. Selvig, and thus Mercola.com is a citizen of the State of Illinois. Dr. Mercola is the principal manager of Mercola.com.

11.     Abdou is, and at all relevant times has been, a domiciliary and citizen of the State of California. Abdou is an insurance broker who sells policies from various insurance carriers, including Minnesota Life.

12.    Minnesota Life, which does business in Illinois, is an affiliate of Securian Financial Group, Inc. a corporation incorporated in Delaware and registered as a foreign corporation in Illinois.

13.    Koenig is a Maryland limited liability company. On information and belief, its members are all citizens of Maryland, and thus Koenig is a citizen of Maryland. Koenig provides financial planning and insurance services to high net worth individuals. Koenig is, and at all relevant times was, Abdou's employer.

14.    Ziebold is, and at all relevant times has been, a domiciliary and citizen of the State of California. Ziebold is an attorney who resides and practices in California.

15.    Ferruzzo & Ferruzzo is a limited liability partnership domiciled in California, located at 3737 Birch, Suite 400, Newport Beach, California 92660. Ferruzzo & Ferruzzo was Defendant Ziebold's employer from August, 2008-October 2010.

16.    Ziebold Law Group is a California Law Corporation domiciled in California. Ziebold Law Group has been Ziebold's employer from the time it was formed in approximately October 2010 to the present.

## JURISDICTION AND VENUE

17.    This Court has diversity of citizenship jurisdiction under 28 U.S.C. §1332(a)(1), because the present matter is a civil action where the matter is controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391, because a substantial part of the actions and transactions at issue occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

19.    In 2009, Dr. Mercola was interested in updating his estate plan, and in particular taking steps to provide for asset protection, business succession, and charitable giving upon his death.

20.    In achieving his estate planning goals, Dr. Mercola further desired to avoid high risk investments and large commitments of capital.

21.    On or about December 8, 2009, Dr. Mercola had a teleconference with his financial advisor at the time, Garrett Gunderson ("Gunderson"), during which Dr. Mercola notified Gunderson of his estate planning goals and investment parameters. After being informed of Dr. Mercola's goals, Gunderson advised Dr. Mercola to consult with Abdou—an insurance broker who worked for Koenig and who sold Minnesota Life policies with Minnesota Life's

knowledge and consent —regarding the potential for a premium financed life insurance arrangement.

22.    On or about December 24, 2009, Dr. Mercola spoke with Abdou over the phone for the first time. During the call, Dr. Mercola informed Abdou of his estate planning goals, his desire to avoid high-risk investments and his desire to avoid large commitments of capital. During the call, Abdou represented to Dr. Mercola that Dr. Mercola was the perfect candidate for premium financed life insurance because such a product would allow Dr. Mercola to secure a substantial amount of life insurance with no out-of-pocket expense other than posting an initial cash deposit along with pledging the policies as collateral for the premium loans, and that premium financed life insurance would accomplish all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals. As a result of Abdou's representations during this call, Dr. Mercola continued to seek insurance advice from Abdou and Koenig.

23.    On January 7, 2010, Dr. Mercola spoke again with Abdou over the phone. Abdou introduced Dr. Mercola to attorney Ziebold, an associate with Defendant Ferruzzo & Ferruzzo. During that call, Abdou urged Dr. Mercola to retain Ziebold and his firm, Defendant Ferruzzo & Ferruzzo as his attorneys. Abdou advised Dr. Mercola that Ziebold was familiar with premium financed life insurance arrangements, and that he was an excellent estate planning attorney. Abdou advised Dr. Mercola that Ziebold could review the premium financed life insurance structure, review the loan documents in connection with borrowing funds from a bank, and could provide excellent legal representation regarding Dr. Mercola's estate plan and business succession plan. Dr. Mercola informed Ziebold of his estate planning, asset protection, business succession and charitable giving goals, his desire to avoid high-risk investments, and his desire to avoid large commitments of capital.

24.    On January 7, 2010, at Abdou's urging, Dr. Mercola retained Ferruzzo & Ferruzzo, and Ziebold in particular, to represent him in connection with the proposed premium financed life insurance arrangement and in planning his estate.

25.    Dr. Mercola spoke with Abdou and Ziebold several more times in early 2010. For example:
    a.  Dr. Mercola spoke with Abdou and Ziebold over the phone on January 26, 2010.
    b.  Dr. Mercola spoke with Abdou and Ziebold over the phone on February 19, 2010.
    c.  Dr. Mercola spoke over the phone with Abdou and Steve Rye (a key employee of Dr. Mercola) on February 11, 2010.
    d.  Dr. Mercola spoke with Abdou over the phone on March 20, 2010.
    e.  Dr. Mercola spoke with Abdou over the phone on May 17, 2010.
    f.  Dr. Mercola spoke with Abdou over the phone on May 31, 2010.
    g.  Dr. Mercola met with Abdou and Rebecca Ryan (a Senior Vice President at Northern Trust responsible for premium financed life insurance lending arrangements) at Dr. Mercola's office on May 27, 2010.
    h.  On June 9, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye and Amy Legaspi, one of Dr. Mercola's employees.
    i.  On June 28, 2010, Dr. Mercola spoke with Abdou over the phone with Steve Rye, Amy Legaspi, and Chris Portera, Dr. Mercola's tax accountant.

26.    During the teleconferences and meeting, Abdou continued to represent to Dr. Mercola that premium financed life insurance was "perfect" for Dr. Mercola, and told Dr. Mercola that premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals.

27.    During the teleconferences and meeting, Abdou explained to Dr. Mercola that premium financed life insurance would allow him to secure a large amount of life insurance by using a bank's money to pay the life insurance premiums, and that Dr. Mercola would incur no out-of-pocket expenses. Abdou represented that the only collateral required for the loans would be the policies themselves plus an initial cash deposit. Abdou also represented that the premiums paid for the life insurance would accumulate value in the policies, and that such accumulated values in the policies could be invested in the stock market or in a fixed yield account. Abdou further represented that the accumulated values would earn returns that would both cover the loan interest and eventually repay the loan principal. Abdou advised Dr. Mercola to acquire the life insurance policies from Minnesota Life and to borrow the funds to pay the insurance premiums from Northern Trust.

28.    At all times in 2009 and 2010, Dr. Mercola informed Abdou that he was only interested in a conservative, low-risk investment that would achieve his estate planning, asset protection, business succession, and charitable giving goals. To that end, Dr. Mercola informed Abdou that he did not want his premium payments invested in the stock market. Instead, Dr. Mercola wanted the money invested in a fixed yield account, a conservative investment which would generate the same rate of return each year, regardless of the performance of the market. Abdou stated that investing the premium payments in a fixed yield account would be perfect for the proposed premium financed life insurance arrangement, because the return from the fixed yield account would be greater than or equal to the required interest payments on the loan from Northern Trust to finance the cost of the premiums.

29.    At all times in 2009 and 2010, Abdou stressed that premium financed life insurance was a suitable strategy for all of Dr. Mercola's goals. At no time did Abdou discuss other insurance options for Dr. Mercola. Moreover, Abdou presented no other financial products or potential solutions, and Abdou presented no policy value options other than securing the maximum dollar amount Minnesota Life would underwrite. At no time did Abdou ask Dr. Mercola whether he had the cash on hand to secure the life insurance without borrowing funds. Abdou never asked whether Dr. Mercola had alternative uses for his cash that would justify the strategy of borrowing money to pay the premiums, rather than paying the premiums himself.

30.    At no time did Abdou disclose to Dr. Mercola any risks associated with the premium financed life insurance arrangement. In fact, Abdou did just the opposite: he repeatedly guaranteed the suitability, lack of risk, and "bullet proof" nature of the premium financed life insurance arrangement.

31.    On information and belief, Abdou and Ziebold had entered into an arrangement, pursuant to which Abdou shared with Ziebold the commissions earned from the sale of life insurance to

Plaintiffs and others, from which Minnesota Life, Ferruzzo & Ferruzzo and Ziebold Law Group benefited. This arrangement was never disclosed to Dr. Mercola by Abdou or Ziebold.

32. Also on information and belief, Abdou and Ziebold have an arrangement, whereby Abdou recommends Ziebold to his clients who are purchasing large premium financing life insurance, in an effort to help close the life insurance sale and promote the premium financing life insurance arrangement, from which Minnesota Life, Ferruzzo & Ferruzzo and Ziebold Law Group benefited.

33. On information and belief, Abdou and Ziebold worked together on numerous occasions over many years to support each other in selling premium financed life insurance to other high net worth individuals, from which Minnesota Life, Ferruzzo & Ferruzzo and Ziebold Law Group benefited.

34. None of the Defendants ever disclosed to Dr. Mercola that Abdou and Ziebold work together on numerous premium financed life insurance arrangements each year, with Abdou selling the premium financing life insurance arrangement, and Ziebold blessing the premium financing structure. Upon information and belief, Abdou referred clients to Ziebold because he knew Ziebold, a supposedly independent legal advisor, would recommend the premium financed life insurance arrangement, regardless of whether it was in the client's best interest. Ziebold never disclosed to Dr. Mercola that his representation was conflicted due to his relationship with Abdou, or that he always recommended premium financed life insurance arrangements to clients referred to him by Abdou, nor did Ziebold's employers Ferruzzo & Ferruzzo or Ziebold Law Group.

35. On July 26, 2010, Abdou presented Dr. Mercola with purported policy illustrations for the Minnesota Life insurance policies that explained how the proposed premium financing arrangement would allegedly work. According to Abdou's illustrations, Dr. Mercola would not be required to spend money out of pocket to support the loan. The illustrations were flawed and deliberately deceptive in a number of ways. For example:

   a. The illustrations failed to disclose that the Minnesota Life insurance policies would incur policy charges of approximately $68,000 each month, and failed to account for such charges in the value projections.
   b. The illustrations failed to accurately reflect the rate of return generated by the Minnesota Life insurance policies. Specifically, although the fixed rate of return for invested premiums on the policies was 3%, the illustrations used a fixed rate of return of 5%.
   c. The illustrations failed to identify the amount of collateral that would be required to support the loans used to pay the premiums for the Minnesota Life insurance policies.

36. Dr. Mercola agreed to participate in the premium financed life insurance arrangement Abdou proposed, based on the flawed policy illustrations for the Minnesota Life insurance policies, the representations and omissions Abdou and Ziebold made, and on Ziebold's advice and approval of the arrangement. Specifically, Plaintiffs obtained the following Minnesota Life insurance policies:

| Policy Date | Policy Number | Insured | Beneficiary | Coverage |
|---|---|---|---|---|
| 08/01/2010 | 2-513-132W | Joseph M. Mercola | Joseph M. Mercola Declaration of Trust | $50M |
| 09/24/2010 | 2-518-809W | Joseph M. Mercola | Mercola. com Health Resources LLC | $14M |
| 10/01/2010 | 2-518-762W | Joseph M. Mercola | The Mercola Insurance Trust | $21M |
| 11/19/2010 | 2-525-244W | Steven Andrew Rye | Mercola.com Health Resources LLC | $15M |

37. The annual premiums for these four Minnesota Life insurance policies (the "Minnesota Life Policies") totaled $5,846,694.42.

38. Abdou also introduced Dr. Mercola to Rebecca Ryan, who was at that time a Senior Vice President of Northern Trust. Abdou recommended that Northern Trust be the lender for the loans used to support the Minnesota Life Policies. During their meeting on May 27, 2010, Ryan represented to Dr. Mercola that the collateral requirements for his loans would be minimal.

39. Ryan represented to Dr. Mercola that, to secure the loans, Dr. Mercola would be required to assign the Minnesota Life Policies to Northern Trust as collateral. Northern Trust also required Dr. Mercola to post cash collateral in the amount of $550,000.

40. Mercola was concerned about posting such substantial collateral. In the spring and summer of 2010, Abdou and Ziebold reassured Dr. Mercola that, beyond the initial $550,000, no additional collateral would be needed because the fixed 3% returns generated by the Minnesota Life Policies would be sufficient to cover the fixed 3% interest rate on the loans, and thus the assignment of the policies plus the $550,000 cash collateral would be sufficient security for the loans.

41. At the urging of Abdou and Ziebold, Dr. Mercola arranged to finance the premiums for the Minnesota Life Policies with loans from Northern Trust.

42. In reliance on the misrepresentations and omissions of Abdou and Ziebold, the Plaintiffs acquired the four Minnesota Life Policies, financed by loans from Northern Trust.

43. In July 2011, contrary to Abdou and Ziebold's prior representations, Northern Trust required Dr. Mercola to post an additional $530,000 cash collateral. Northern Trust told Dr. Mercola represented that, if Dr. Mercola did not post the additional collateral, Northern Trust would not advance the funds necessary to pay the second year's premiums for the Minnesota Life Policies.

44. The requirement for the additional collateral in July 2011 was primarily driven by two factors: (a) the interest charged for the loans was being added to the loan balance, thereby increasing the principal amount of the loan, and (b) Northern Trust was only using 95% of the surrender value of each Minnesota Life Policy as collateral, as opposed to the full surrender value.

45. For the same reasons, in September 2011, in addition to the $530,000 additional cash collateral posted in July 2011 for policy 2-513-132W, Dr. Mercola was required to post an additional $194,000 cash collateral (for policies 2-518-809W, 2-518-762W and 2-525-244W).

46. Dr. Mercola was shocked and concerned at Northern Trust's demands. Neither Abdou nor Ziebold ever told Dr. Mercola that the interest charged for the loan would be added to the loan balance, or that doing so would cause Northern Trust to require additional collateral. Prior to July 2011, neither Abdou nor Ziebold ever told Dr. Mercola that only 95% of the surrender value of the Minnesota Life Policies would be used as collateral for the premium loans.

47. Furthermore, neither Abdou nor Ziebold ever advised Dr. Mercola that any additional collateral could be required to extend the loans necessary to continue the financing arrangement. In fact, Abdou and Ziebold continually, told Dr. Mercola that no additional collateral would ever be required.

48. Rather than permit the Minnesota Life Policies to lapse, Dr. Mercola posted the additional collateral, extended the loans, and paid the second year's premiums for the Minnesota Life Policies.

49. Abdou recognized that Dr. Mercola was very upset with the misrepresentations Abdou and Ziebold had made and that Dr Mercola was required to post substantial additional collateral. Thus, in 2012, Abdou informed Dr. Mercola that he had been able to negotiate the Northern Trust loan interest rate down from 3% to 2%.

50. Dr. Mercola, concerned about the increasing loan balance and collateral requirements, decided to pay the interest directly instead of having the interest accumulate as part of the loan balance. As a result, Dr. Mercola made the following interest payments to Northern Trust:

      a. December 31, 2012: $143,844.46;
      b. June 28, 2013: $181,981.24; and
      c. January 17, 2014: $156,368.65.

51.   On August 10, 2012, on behalf of Northern Trust, Ryan informed Dr. Mercola that no additional collateral was required to extend the loans necessary to fund the premiums for the Minnesota Life Policies in 2012.

52.   Dr. Mercola's loans were thus extended, and Northern Trust advanced the sums to pay the third year's premiums for the Minnesota Life Policies.

53.   The following year, on September 25, 2013, on behalf of Northern Trust, Ryan sent an email to Dr. Mercola showing a collateral shortfall of $2.9 million. As a result of the shortfall, Ryan informed Dr. Mercola that he would need to post at least $2.9 million in additional cash collateral to extend the loans and to keep the Minnesota Life Policies in effect.

54.   The sudden increase in the collateral requirement was due to the expiration of a Surrender Value Enhancement Agreement that was a rider to each of the Minnesota Life Policies.

55.   The Surrender Value Enhancement Agreement provided that, for the first three years of the Minnesota Life Policies, Dr. Mercola could surrender the Minnesota Life Policies at any time and receive a surrender value equal to the amount he had paid in premiums to that point in time. Thus, for the first three years of the Minnesota Life Policies (until 2013), the surrender value of the Minnesota Life Policies was higher than it otherwise would have been, and thus, Dr. Mercola did not have to post as much additional collateral as he would in the future.

56.   However, in 2013, when the Surrender Value Enhancement Agreement expired, the surrender value of the Minnesota Life Policies did not equal the amount Dr. Mercola had paid in premiums. Rather, the surrender value equaled only the accumulated value of the Minnesota Life Policies, less undisclosed surrender charges to that point. Thus, the surrender value fell to significantly less than the total premiums Dr. Mercola had paid. Unbeknownst to Dr. Mercola, policy charges (approximately $68,000 per month) were being deducted from the accumulated value in the policies. Also unbeknownst to Dr. Mercola, the surrender value of the Minnesota Life Policies was no longer protected by the Surrender Value Enhancement Agreement. As a result, in 2013 the accumulated value in the Minnesota Life Policies was much lower than expected, and the collateral required by Northern Trust to support the loans increased dramatically.

57.   Neither Abdou nor Ziebold had ever informed Dr. Mercola that such large sums of collateral could be required by Northern Trust. In fact, such a collateral requirement was contrary to the representations made by Abdou and Ziebold. Had Dr. Mercola been aware of the true arrangement and collateral requirements, he never would have entered into a premium financed life insurance arrangement and agreed to pay for the Minnesota Life Policies.

58.   Neither Abdou nor Ziebold ever disclosed to Dr. Mercola that the Surrender Value Enhancement Agreement could not be renewed beyond the first three years. Furthermore, neither Abdou nor Ziebold ever explained the effect the expiration of the Surrender Value Enhancement Agreement would have on Dr. Mercola's collateral until after the Surrender Value Enhancement Agreement had expired.

59. Furthermore, on multiple occasions, including in an email dated October 1, 2013 (after the Surrender Value Enhancement Agreement had apparently already expired), Abdou assured Dr. Mercola that the Surrender Value Enhancement Agreement rider remained in effect, and would remain in effect.

60. Neither Abdou nor Ziebold ever disclosed to Dr. Mercola the substantial monthly policy charges associated with the Minnesota Life Policies, that the policy charges decreased the accumulated value of the Minnesota Life Policies, or the effect such charges would have on the collateral requirements for the loans.

61. Indeed, when Dr. Mercola had inquired of Abdou in 2010 what policy charges would occur in the future, Abdou informed Dr. Mercola that such charges were minimal and were not to be worried about.

62. On or about October 22, 2013, Abdou sent Dr. Mercola an email that disclosed, for the first time, the total collateral requirements for the loans. Contrary to what Abdou and Ziebold had previously told Dr. Mercola, Abdou's email explained that Dr. Mercola would need to post millions of dollars of additional collateral each year, up to $8.4 million in additional collateral by 2016.

63. Dr. Mercola never would have participated in the premium financed life insurance arrangement had he known the true costs of the Minnesota Life Policies and the true collateral requirements.

64. On or around February 28, 2014, after learning of the previously concealed policy costs and collateral requirements, Dr. Mercola elected to surrender all four Minnesota Life Policies and repay the Northern Trust loans. Dr. Mercola forfeited the $14,956,575.53 surrender value of the policies, the $1.3 million in cash collateral that he previously posted, and additional out-of-pocket sums.

65. In total, Dr. Mercola, through his trusts and company, lost more than $3 million as a result of the premium financed life insurance arrangement.

## COUNT I: Breach of Fiduciary Duty
### (Plaintiffs v. Abdou, Koenig, and Minnesota Life)

66. Plaintiffs incorporate by reference paragraphs 1 through 65 as though fully restated herein.

67. As Plaintiffs' insurance broker, Abdou, individually and on behalf of Koenig, owed Dr. Mercola and Plaintiffs certain fiduciary duties, including but not limited to a duty to: (a) advise Dr. Mercola of all available insurance options; (b) advise Dr. Mercola of all of his financial options to achieve his respective goals in accordance with his investment parameters; (c) determine the suitable insurance products based on Dr. Mercola's financial situation, goals, and desires; (d) fully disclose all material facts regarding the insurance products presented,

including the advantages and risks associated therewith; (e) exercise reasonable skill and diligence in selecting policies for Dr. Mercola; and (f) not mislead Dr. Mercola.

68.  At all times when dealing with Dr. Mercola and Plaintiffs, Abdou acted within the scope of his employment at Koenig.

69.  Abdou, individually, on behalf of Koenig, and to the benefit of Minnesota Life, breached his fiduciary duties by:

    a.  Failing to advise Dr. Mercola of life insurance alternatives other than premium financed life insurance;

    b.  Failing to provide life insurance quotes from any company other than Minnesota Life;

    c.  Failing to inquire as to whether Dr. Mercola had sufficient cash flow to pay life insurance premiums without the need to borrow funds, or whether Dr. Mercola had an alternative use for available funds (that would support borrowing the funds from a bank);

    d.  Failing to analyze whether any available level of life insurance coverage other than the maximum amount was appropriate for Dr. Mercola;

    e.  Failing to advise Dr. Mercola as to the proper amount of life insurance needed to meet his estate planning, asset protection, business succession and charitable giving goals;

    f.  Failing to disclose the policy costs associated with the Minnesota Life Policies that Abdou recommended;

    g.  Failing to disclose the full collateral requirements associated with the Minnesota Life Policies that Abdou recommended;

    h.  Failing to monitor the performance of the policies and advise Dr. Mercola of the additional collateral that would be required to maintain the Minnesota Life Policies;

    i.  Advising Dr. Mercola to purchase life insurance policies with significantly higher death benefits than were necessary or prudent for Dr. Mercola's needs, to increase the commissions payable to Abdou and Koenig;

    j.  Failing to advise Dr. Mercola that the insurance policies would never become self-financing if the accumulated policy value was placed in a 3% fixed yield account;

    k.  Failing to disclose that the Surrender Value Enhancement Agreement was only in effect for three years, and would not be renewable beyond the first three years;

    1.  Failing to disclose the effect of the Surrender Value Enhancement Agreement's expiration on Dr. Mercola's collateral position for the Minnesota Life Policies;

    m.  Misrepresenting to Dr. Mercola that no additional out-of-pocket expense to maintain the Minnesota Life Policies would be required beyond an initial collateral deposit and the policies themselves;

    n.  Misrepresenting to Dr. Mercola that the Surrender Value Enhancement Agreement was renewable, and thus the surrender value of the policies would always equal or exceed the cumulative premiums paid into the Minnesota Life Policies;

    o.  Misrepresenting to Dr. Mercola that the policy costs were "low" and "nothing to worry about"; and

    p.  Failing to otherwise properly advise Dr. Mercola.

70.   On information and belief, Minnesota Life authorized, or knowingly allowed, Abdou and/or Koenig to sell Minnesota Life policies on its behalf. On information and belief, Minnesota Life knew, or acted in reckless disregard, of the improper manner in which Abdou misrepresented its policies to Plaintiffs and others, so that it could earn premium income from the sale of such policies.

71.   As a result of the foregoing breaches of fiduciary duties, Plaintiffs were damaged in excess of $3 million.

72.   Minnesota Life knowingly accepted the benefits of the foregoing breaches of fiduciary duty and wrongful conduct of Abdou.

**WHEREFORE,** Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou, Koenig, and Minnesota Life as follows:

  a.   Finding that Abdou, individually and on behalf of Koenig, and to the benefit of Minnesota Life, breached his fiduciary duties;
  b.   Awarding Plaintiffs the damages suffered as a consequence of the breach of fiduciary duties, in an amount not less than $3,000,000, jointly and severally against Abdou, Koenig, and Minnesota Life, the exact amount of which will be proven at trial;
  c.   Requiring Abdou, Koenig, and Minnesota Life to disgorge all commissions earned in connection with the sale of the Minnesota Life Policies to Plaintiffs;
  d.   Imposing a punitive damage award against Abdou, Koenig, and Minnesota Life;
  e.   Awarding Plaintiffs the costs of this action; and
  f.   Awarding such other and further relief as the Court deems just.

## COUNT II: Negligent Misrepresentation
### (Plaintiffs v. Abdou and Koenig)

73.   Plaintiffs incorporate by reference paragraphs 1 through 72 as though fully restated herein.

74.   Koenig and its employees, including Abdou, are in the business of supplying information for the guidance of others in their business transactions.

75.   At all times when dealing with Dr. Mercola and Plaintiffs, Abdou acted within the scope of his employment at Koenig.

76.   As Plaintiffs' insurance broker, Abdou, individually and on behalf of Koenig, owed Dr. Mercola and Plaintiffs certain fiduciary duties, including but not limited to a duty to: (a) advise Dr. Mercola of all available insurance options; (b) advise Dr. Mercola of all of his financial options to achieve his respective goals in accordance with his investment parameters; (c) determine the suitable insurance products based on Dr. Mercola's financial situation, goals, and desires; (d) fully disclose all material facts regarding the insurance products presented,

including the advantages and risks associated therewith; (e) exercise reasonable skill and diligence in selecting policies for Dr. Mercola; and (1) not mislead Dr. Mercola.

77.   Abdou, individually, on behalf of Koenig, made the following false statements of material fact:
    a.  Advising Dr. Mercola that he needed life insurance policies with significantly higher death benefits than were necessary or prudent for Dr. Mercola's needs;
    b.  Misrepresenting to Dr. Mercola that no additional out-of-pocket expense to maintain the Minnesota Life Policies would be required beyond an initial collateral deposit and the policies themselves;
    c.  Misrepresenting to Dr. Mercola that the Surrender Value Enhancement Agreement was renewable, and thus the surrender value of the policies would always equal or exceed the cumulative premiums paid into the Minnesota Life Policies;
    d.  Misrepresenting to Dr. Mercola that the policy costs were "low" and "nothing to worry about"; and
    e.  Making further misrepresentations to Dr. Mercola.

78.   Abdou, on information and belief, made these misrepresentations as a result of his carelessness or negligence, in failing to ascertain the truth of the statements he made to Dr. Mercola.

79.   Abdou, on information and belief, made these misrepresentations as Dr. Mercola's fiduciary with the intent to induce Dr. Mercola to purchase the Minnesota Life Policies.

80.   Dr. Mercola in fact did purchase the Minnesota Life Policies in reliance on the truth of the misrepresentations Abdou his fiduciary, made to him.

81.   As a result of the foregoing negligent misrepresentations made by Abdou, Plaintiffs were damaged in excess of $3 million.

**WHEREFORE,** Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou and Koenig as follows:
    a.  Finding that Abdou, individually and on behalf of Koenig and to the benefit of Minnesota Life, negligently misrepresented material facts;
    b.  Awarding Plaintiffs the damages suffered as a consequence of the negligent misrepresentations, in an amount not less than $3,000,000, jointly and severally against Abdou and Koenig, the exact amount of which will be proven at trial;
    c.  Requiring Abdou and Koenig to disgorge all commissions earned in connection with the sale of the Minnesota Life Policies to Plaintiffs;
    d.  Imposing a punitive damage award against Abdou and Koenig;
    e.  Awarding Plaintiffs the costs of this action; and
    f.  Awarding such other and further relief as the Court deems just.

## COUNT II: Legal Malpractice
### (Plaintiffs v. Ziebold, Ferruzzo & Ferruzzo, and Ziebold Law Group)

82.   Plaintiffs incorporate by reference paragraphs 1 through 81 as though fully restated herein.

83.   Dr. Mercola retained Ziebold and his then-employer, Ferruzzo & Ferruzzo, to analyze and implement a comprehensive estate plan for Dr. Mercola, including an independent review of the premium financing life insurance arrangement proposed by Abdou. As Dr. Mercola's attorneys, Ziebold and Ferruzzo & Ferruzzo owed Dr. Mercola fiduciary duties of the highest order.

84.   When Dr. Mercola retained Ziebold and Ferruzzo & Ferruzzo to perform estate planning services, Dr. Mercola identified several goals that he wanted his estate plan to achieve.

85.   Dr. Mercola explained to Ziebold that he wanted to establish a structure to protect his assets from potential creditors.

86.   In addition, Dr. Mercola explained to Ziebold that he wanted to pass along management control of Mercola.com to his key employees.

87.   Dr. Mercola also explained to Ziebold that he wanted to ensure that the bulk of his assets would pass to a charity of his choosing, with minimum tax consequences.

88.   The course of action recommended by Ziebold met none of Dr. Mercola's objectives. Ziebold, while employed at Ferruzzo & Ferruzzo, exploited his position as Dr. Mercola's attorney and fraudulently induced Dr. Mercola to obtain the Minnesota Life Policies. Ziebold falsely advised Dr. Mercola that premium financed life insurance was a "no-brainer," that it had no risks, and that it would meet all of his estate planning goals. Ziebold's intent was to bless the premium financed life insurance scheme for Abdou's and Ziebold's benefit, as well as for the benefits of Minnesota Life, Koenig, and Ferruzzo & Ferruzzo. In violation of his fiduciary duties, Ziebold advised Dr. Mercola to enter into an arrangement that benefited Abdou, Ziebold, and the remaining Defendants at Dr. Mercola's expense.

89.   On information and belief, Ziebold urged Dr. Mercola to obtain premium financed life insurance because Abdou referred and refers many clients to Ziebold both during his employment at Ferruzzo & Ferruzzo, and since he has begun practicing at Ziebold Law Group. To continue receiving the benefits of this arrangement, and to retain Abdou as a referral source, Ziebold recommended the premium financed life insurance arrangement to Dr. Mercola and implemented all the legal work necessary to close the sale of the Minnesota Life policies.

90.   On information and belief, Ziebold, while employed by Ferruzzo & Ferruzzo, urged Dr. Mercola to obtain premium financed life insurance because he shared in the commissions generated by the sale of such policies either directly or through Ferruzzo & Ferruzzo.

91.    Premium financed life insurance was entirely unsuitable for a client with Dr. Mercola's estate planning, asset protection, business succession and charitable giving objectives. It was also unsuitable for a client who wished to (a) invest conservatively in fixed income products, and (b) avoid large commitments of capital.

92.    Ziebold failed to familiarize himself with Illinois law concerning creditor protection issues in advising Plaintiffs. For example, Ziebold (who is not licensed in Illinois) guaranteed that the values of the life insurance policies were completely protected from creditors. However, this was not the case under the applicable Illinois statute.

93.    Furthermore, the excessive benefit conferred by the Minnesota Life policies had no specific purpose in Dr. Mercola's estate plan. Rather, the amount of coverage secured was simply the maximum amount that Minnesota Life would underwrite, and thus the amount that would generate the largest premiums and commissions for Abdou and Ziebold, for their benefit and for the benefit of Ferruzzo & Ferruzzo.

94.    Other portions of the estate plan Ziebold implemented were flawed or nonexistent. For example, Dr. Mercola wanted the management of Mercola.com to be transferred to his key employees after his death. Ziebold failed to implement such a succession plan.

95.    The estate plan Ziebold and Ferruzzo & Ferruzzo set up would have transferred most of Dr. Mercola's assets (including Mercola.com) to Dr. Mercola's private charitable foundation upon his death. Ziebold, however, never advised Dr. Mercola of the extreme adverse tax consequences of a private charitable foundation owning a majority interest in a valuable operating business such as Mercola.com.

96.    As an estate planning attorney, Ziebold knew or should have known of the flaws in the overall estate plan he implemented on Dr. Mercola's behalf, as well as the inherent flaws in the premium financed life insurance portion of the estate plan. Nevertheless, Ziebold recommended that Dr. Mercola pursue the premium financed life insurance.

97.    Ziebold did not perform the comprehensive estate planning that Dr. Mercola retained Ferruzzo & Ferruzzo to provide. In addition, any estate planning Ziebold implemented was fundamentally flawed and had to be redone by new estate planning counsel.

98.    On information and belief, Ziebold's business as a solo practitioner, Ziebold Law Group, which he started after leaving Ferruzzo & Ferruzzo in or after October 2010, also derived benefits from Ziebold's malpractice in representing Dr. Mercola.

99.    Ziebold and his employers Ferruzzo & Ferruzzo and Ziebold Law Group breached the standard of care an attorney owes to his client and committed legal malpractice by:
    a.  Failing to appropriately structure Dr. Mercola's estate plan;
    b.  Implementing an estate plan that upon Dr. Mercola's death would have led to severe adverse tax consequences if Dr. Mercola's controlling interest in Mercola.com was transferred to Dr. Mercola's private foundation.

c. Failing to disclose his conflict of interest generated by his relationship with Abdou;

d. Failing to disclose that he and Abdou had worked on and implemented numerous premium financed life insurance arrangements together and that he has a clear interest and bias to this type of planning;

e. Inducing Dr. Mercola to implement a strategy that was detrimental to his interests, but which resulted in substantial gain to Abdou, Ziebold, and the rest of the Defendants;

f. Improperly encouraging Dr. Mercola to purchase excessive amounts of premium financed life insurance;

g. Incorrectly advising Dr. Mercola that premium financed life insurance was a "bullet proof" asset protection strategy and the cash value of the policy was guaranteed to be protected;

h. Incorrectly advising Dr. Mercola that premium financed life insurance would achieve all of Dr. Mercola's stated estate planning, asset protection, business succession and charitable giving objectives, when Ziebold knew or should have known that this was not true;

i. Failing to disclose the policy charges associated with the four Minnesota Life Policies;

j. Failing to disclose the collateral requirements associated with the Northern Trust loans and the potential adverse effects related thereto;

k. Failing to advise that the Surrender Value Enhancement Agreement was only effective for three years;

l. Failing to advise that the Surrender Value Enhancement Agreement was potentially non-renewable;

m. Failing to advise Dr. Mercola of the effect that the Surrender Value Enhancement Agreement's expiration would have on his collateral position with Northern Trust; and

n. Otherwise failing to represent Dr. Mercola.

100. As a result of Ziebold's and Ferruzzo & Ferruzzo's breaches of fiduciary duty and legal malpractice, Dr. Mercola was forced to obtain new estate planning counsel and incur costs to correct his estate planning. Through his trusts and his company, Mercola.com, Dr. Mercola was damaged in excess of $3 million.

**WHEREFORE,** Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Ziebold:

a. finding that Ziebold and Ferruzzo & Ferruzzo committed legal malpractice;

b. awarding Plaintiffs the damages suffered as a consequence of the legal malpractice, in an amount not less than $3,000,000, the exact amount of which will be proven at trial;

c. requiring Ziebold, Ferruzzo & Ferruzzo, and Ziebold Law Group to disgorge all fees he and they received from Plaintiffs;

d. awarding Plaintiffs an amount equal to the attorneys' fees they incurred to correct Ziebold's negligent work;

e. awarding Plaintiffs the costs of this action; and

f.   awarding such other and further relief the Court deems just.

## COUNT III: Fraud
## (Plaintiffs v. Abdou)

101.     Plaintiffs incorporate by reference paragraphs 1 through 100 as though fully
restated herein.

102.     Abdou is an insurance broker specializing in the sale of premium financed life
insurance.

103.     Life insurance brokers are typically compensated by receiving a large portion of
the first year's premiums as a commission. Because the premiums are determined in part
by the face amount of the life insurance, brokers such as Abdou have a strong financial
incentive to sell life insurance policies with a high face amount.

104.     Premium financed life insurance is a product that allows an insured to acquire a
life insurance policy with a higher face amount than might otherwise be available. It is
also a product that allows a broker to reap a significantly larger commission if the insured
can be persuaded to obtain premium financed life insurance.

105.     In his 2009 and 2010 meetings with Dr. Mercola (described more fully above),
Abdou induced Dr. Mercola, on behalf of Plaintiffs, to obtain premium financed life
insurance, despite such insurance not being suitable for a person with Dr. Mercola's
stated estate planning goals and investment parameters. Furthermore, there was no reason
for the exorbitant amount of life insurance Abdou recommended, other than that it was
the maximum amount of coverage that Defendant Minnesota Life would offer
Dr. Mercola, it had the highest possible premium, and thus, it maximized the
commissions that Abdou would receive.

106.     In inducing Dr. Mercola to obtain premium financed life insurance, Abdou made
several misrepresentations, all of which he knew were false at the time he made them.

107.     Specifically, during meetings with Dr. Mercola during 2009 and 2010, Abdou
made the following misrepresentations:

| Abdou Misrepresentations | Actual Facts |
| --- | --- |
| The policy charges would be "low" and "nothing to worry about." | The policy charges were not "low."  In fact, the policy charges were approximately $68,000 *per month*. |
| Premium financed life insurance was a "silver | Premium financed life insurance did not meet |

| Abdou Misrepresentations | Actual Facts |
|---|---|
| bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals. | any of Dr. Mercola's goals for estate planning, asset protection, business succession or charitable giving. |
| The policies would become self-funding, as the earnings on the accumulated value in the policies would be more than sufficient to cover the costs associated with the financing. | The policies would not become self-funding with the fixed yield rate of return, because the earnings on the accumulated value of the policies would never generate sufficient returns to cover the policy charges and the loan interest. |
| The premium financed life insurance arrangement was a tax efficient planning tool; | The insurance policies were a poor vehicle for distributing funds to charity, as the structure recommended by Abdou and Ziebold would have resulted in significant negative tax consequences at the time of Dr. Mercola's death. |
| The policies would provide significant asset protection. | The policies did not provide significant asset protection, because under Illinois law both the insurance policies themselves and the collateral posted by Dr. Mercola were accessible to creditors. |
| The Surrender Value Enhancement Agreement rider on the policies could be renewed. | The Surrender Value Enhancement Agreement was not renewable after three years, and the expiration of that Agreement would trigger significant demands for additional collateral. |
| Dr. Mercola would not need to post additional collateral to maintain the Northern Trust loans, because the surrender value of the policies would be sufficient collateral. | Dr. Mercola would need to post substantial amounts of additional collateral to maintain the loans, because as a result of undisclosed policy charges the surrender value of the insurance policies was significantly lower. |
| Abdou would not receive any commissions on the policies unless Dr. Mercola up front maintained the policies for a period of several years. | Abdou received substantial commissions when the policies were purchased. |
| The policy illustrations (written instruments | The illustrations failed to disclose that the |

| **Abdou Misrepresentations** | **Actual Facts** |
|---|---|
| purportedly designed to illustrate how the life insurance policies would accumulate value over time) Abdou provided to Dr. Mercola on July 26, 2010 were accurate illustrations of how Dr. Mercola's life insurance policies would function and perform. | insurance policies would incur charges of approximately $68,000 each month, failed to account for such charges in the projections, used a 5% fixed rate of return rather than a 3% fixed rate of return, and failed to set forth the amount of collateral that would be required to support the loans used to pay the premiums |

108.     As an insurance broker specializing in premium financed life insurance, Abdou knew that all of the aforementioned representations were false at the time they were made.

109.     Abdou never disclosed to Dr. Mercola his relationships with Ziebold, Ryan, and Northern Trust—the team of advisors that Abdou consistently used to close numerous premium financed life insurance sales.

110.     Abdou made all of the aforementioned misrepresentations with the intention of preying on and inducing Dr. Mercola to purchase premium financed life insurance with high face amounts. These purchases resulted in substantial commissions to Abdou.

111.     Dr. Mercola relied to his detriment on Abdou's aforementioned misrepresentations, by causing Plaintiffs to enter into a premium financed life insurance arrangement.

112.     Dr. Mercola and Plaintiffs never would have participated in the premium financed life insurance arrangement but for Abdou's misrepresentations. Premium financed life insurance did not meet any of Dr. Mercola's estate planning, asset protection, business succession or charitable giving goals. Furthermore, premium financed life insurance did not comport with Dr. Mercola's stated investment parameters, because it would have required high-risk investments in order to offset the significant policy costs, and because it required large outlays of capital for collateral.

113.     The sole reason Dr. Mercola and Plaintiffs participated in premium financed life insurance was because Dr. Mercola believed, based on Abdou's misrepresentations, that premium financed life insurance was a suitable product for someone with Dr. Mercola's specific estate planning goals and investment parameters.

114.     Dr. Mercola's reliance on Abdou and Ziebold was reasonable, because Abdou was Dr. Mercola's insurance broker and because Abdou stood in a fiduciary relationship with Dr. Mercola and Plaintiffs, and Ziebold was Dr. Mercola's attorney.

115.     Plaintiffs suffered damages in excess of $3 million as a result of the premium financed life insurance arrangement he was fraudulently induced to enter by Abdou.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou:

a.   finding that Abdou committed fraud;
b.   awarding Plaintiffs the damages suffered as a consequence of the fraud, in  an amount not less than $3,000,000, the exact amount of which will be proven at trial;
c.   imposing a punitive damage award against Abdou;
d.   requiring Abdou and Koenig to disgorge all commissions earned in connection with the sale of premium financed life insurance policies to Plaintiffs;
e.   awarding Plaintiffs the costs of this action; and
f.   awarding such other and further relief the Court deems just.

## <u>COUNT IV: Consumer Fraud</u>
## <u>(Plaintiffs v. Abdou)</u>

116.     Plaintiffs incorporate by reference paragraphs 1 through 115 as though fully restated herein.

117.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.,* prohibits, *inter alia,* deceptive acts or practices in the conduct of any trade or commerce.

118.     As an insurance broker, Abdou engaged in trade and commerce in Illinois in 2009 and 2010.

119.     In conducting trade and commerce, Abdou engaged in deceptive practices when he sold four Minnesota Life Policies to Dr. Mercola and Plaintiffs.

120.     Specifically, Abdou repeatedly told Dr. Mercola that:

a.   The policy charges would be "low" and "nothing to worry about";
b.   Premium financed life insurance was a "silver bullet" that would address all of Dr. Mercola's estate planning, asset protection, business succession, and charitable giving goals;
c.   The Minnesota Life Policies would become self-funding, as the earnings on the accumulated value in the policies would be more than sufficient to cover the costs associated with the financing;
d.   The premium financed life insurance arrangement was a tax efficient planning tool;
e.   The Minnesota Life Policies would provide significant asset protection;
f.   The Surrender Value Enhancement Agreement rider on the policies could be renewed, ensuring that Dr. Mercola would not be at risk for losses as a result of the insurance policies;

g. Dr. Mercola would not need to post additional collateral to maintain the premium loans, because the surrender value of the Minnesota Life Policies would be sufficient collateral;

h. Abdou would not receive any commissions on the Minnesota Life Policies unless Dr. Mercola maintained the policies for a period of several years; and

i. That the illustrations of the Minnesota Life Policies (written instruments purportedly designed to illustrate how the life insurance policies would accumulate value over time) Abdou provided to Dr. Mercola on July 26, 2010 were accurate illustrations of how Dr. Mercola's life insurance policies would work.

121.    Abdou made these misrepresentations to induce Dr. Mercola to purchase the Minnesota Life Policies on behalf of Plaintiffs, which resulted in substantial commissions to Abdou.

122.    Dr. Mercola and Plaintiffs relied to their detriment on Abdou's misrepresentations, and purchased the Minnesota Life Policies using premium financing.

123.    Plaintiffs suffered damages in excess of $3 million as a result of the premium financed life insurance arrangement Dr. Mercola was fraudulently induced to enter by Abdou.

**WHEREFORE**, Joseph Mercola, D.O., as trustee of the Joseph M. Mercola Declaration of Trust, Janet Selvig, as trustee of the Mercola Insurance Trust, and Mercola.com Health Resources, LLC, respectfully request that this Court enter judgment in their favor and against Abdou:

a. finding that Abdou committed consumer fraud in violation of the Act;

b. awarding Plaintiffs the damages suffered as a consequence of the fraud, in an amount not less than $3,000,000, the exact amount of which will be proven at trial;

c. imposing a punitive damage award against Abdou;

d. awarding Plaintiffs reasonable attorneys' fees;

e. awarding Plaintiffs the costs of this action; and

f. awarding such other and further relief the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

 

Joseph Mercola, D.O., as Trustee of
the Joseph M. Mercola Declaration
of Trust, Janet Selvig, as trustee of
the Mercola Insurance Trust, and
Mercola.com Health Resources, LLC

By:   /s/ Olivia St. Clair Long_____
   One of Their Attorneys

Benjamin N. Feder
Brad Grayson
Olivia St. Clair Long
Strauss & Malk LLP
135 Revere Drive
Northbrook, Illinois 60062
(847) 562-1400